# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SELMA DIVISION

|  |  |
|---|---|
| **In re:** | Chapter 11 |
| **JUDSON COLLEGE, INC.,** | Case No. 24-_____-_____ |
| **Debtor**. |  |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
## OF JUDSON COLLEGE, INC.

**THIS DISCLOSURE STATEMENT AND THE PLAN (AS THEY MAY BE AMENDED) WILL BE SUBMITTED FOR APPROVAL BUT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN AND THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THE DISCLOSURE STATEMENT AND THE PLAN ARE NOT OFFERS TO SELL ANY SECURITIES AND ARE NOT SOLICITING AN OFFER TO BUY SECURITIES.**

**BRADLEY ARANT BOULT CUMMINGS LLP**
Co-Counsel for the Debtor
Jay Bender, Esq.
James Bailey, Esq.
1819 5th Avenue North
Birmingham, AL 35203

**SILVER VOIT GARRETT & WATKINS, ATTORNEYS AT LAW, P.C.**
Co-Counsel for the Debtor
Alexandra Garrett, Esq.
4317-A Midmost Drive
Mobile, AL 36609

*Proposed Counsel for the Debtor*
Dated:  January 8, 2024

## EXHIBITS

**Exhibit A**    Chapter 11 Plan of Judson College, Inc.

**Exhibit B**    Comprehensive Mediation Settlement Agreement

**Exhibit C**    Plan Support Agreement

**Exhibit D**    Liquidation Analysis

# IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

Judson College, Inc. (the "Debtor"), an Alabama non-profit corporation and the debtor and debtor in possession in this Chapter 11 Case, submits this Disclosure Statement with information regarding the Chapter 11 Plan of Judson College, Inc., dated January 8, 2024, (as may be amended and supplemented from time to time according to its terms, the "Plan"). A copy of the Plan is attached hereto as Exhibit A.

**References to the "Plan" are to the Plan attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein, including in any Exhibits attached hereto, shall have the meaning ascribed to them in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules.**

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and the delivery of this Disclosure Statement shall not create an implication that there has been no change in information stated since the date hereof.

The Debtor believes that acceptance of the Plan is in the best interests of the Debtor, its Chapter 11 estate, and its creditors. The Plan provides for the implementation of a comprehensive settlement agreement among the Debtor and its main creditor constituencies that, if this Plan is confirmed, will provide for the payment of millions of dollars to the Debtor's creditors from sources that otherwise would not be available for the payment of creditors' claims. Specifically, the Plan provides for the payment to the Debtor's creditors of over $6 million from the Debtor's restricted endowment funds, which funds are not property of the Debtor's bankruptcy estate and thus generally could not be used to pay creditors' claims. In addition, the Plan provides for the payment to creditors of funds furnished by the Baptist Entities that will allow the Debtor to increase Plan distributions to the Debtor's creditors. As part of the comprehensive settlement agreement implemented through this Plan, in consideration for the substantial funds made available to pay Creditor's claims pursuant to the Plan, the Plan provides for releases of claims and causes of action that the Debtor's creditors (including any and all holders of beneficial interests in the Bonds issued for the Debtor's benefit) that such parties have or may have against the Debtor, the Debtor's trustees, officers, employees, and other representatives. Those releases are material to the Debtor's Plan, without which the Debtor's comprehensive settlement agreement cannot be implemented. Creditors should review carefully these release provisions, which are found in Article VIII of the Plan. The Debtor believes that the Plan will enable it to implement its settlement, to wind-down the present operations of the Debtor, and to accomplish the objectives of Chapter 11.

**The Debtor urges creditors to vote to accept the Plan.**

The Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent, as described in Article VII of the Plan. No assurance exists

that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, AND THE DISCLOSURE STATEMENT AND THE PLAN SUPPLEMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN SUMMARY CONTAINED HEREIN AND THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. **THOSE CREDITORS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. <u>SEE</u> ARTICLE VIII BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), OR ANY STATE AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS IN THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED. NONE OF THE SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "<u>SECURITIES ACT</u>") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ALL OFFERS, SALES, EXCHANGES, AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN (A) SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED BY LAW AND APPLICABLE AND (B) TO THE EXTENT THAT THE EXEMPTION SPECIFIED IN SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER. NONE OF THE SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY

AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

ALTHOUGH THE DEBTOR BELIEVES THAT THE FINANCIAL INFORMATION CONTAINED HEREIN FAIRLY AND ACCURATELY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF, EXCEPT AS OTHERWISE SPECIFICALLY NOTED, SUCH FINANCIAL INFORMATION HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

**THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (A) THE DEBTOR; (B) THE DEBTOR'S ESTATE; (C) ALL PERSONS THAT DIRECTLY OR INDIRECTLY HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR CAUSES OF ACTION AGAINST THE DEBTOR OR THE ESTATE, WHETHER KNOWN OR UNKNOWN; AND (D) WITH RESPECT TO THE PERSONS IN CLAUSES (A) THROUGH (C), THEIR REPRESENTATIVES.**

**PLEASE BE ADVISED THAT ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

# ARTICLE I.

## INTRODUCTION AND OVERVIEW

### A.     The Debtor

On January 8, 2024, Judson College, Inc. (the "<u>Debtor</u>") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of Alabama, Selma Division (the "<u>Bankruptcy Court</u>").

### B.     The Plan

The Plan contemplates the implementation of the Debtor's Comprehensive Mediation Settlement Agreement which is defined and described further herein.  Pursuant to the Comprehensive Mediation Settlement Agreement, the effectiveness of which is subject to confirmation of this Plan, the Debtor has conditionally proposed to pay to certain holders of Allowed Claims the net proceeds from the Debtor's Restricted Funds.  The Restricted Funds are restricted endowment funds held by the College that are not property of the Debtor's estate and that generally would not be available to pay claims of the Debtor's creditors absent the Debtor's affirmative cooperation.  However, pursuant to the Comprehensive Mediation Settlement Agreement, the Debtor agreed to seek and has now obtained conditional state court authority to use those Restricted Funds to help pay the Allowed Claims of the Debtor's creditors.  Also pursuant to the Comprehensive Mediation Settlement Agreement, the Baptist Entities have agreed to contribute the Baptist Entities Plan Contribution to help fund distributions to creditors subject to confirmation of the Plan.  The Plan provides also for the liquidation  of substantially all of the property of the Debtor's Estate in accordance with Chapter 11 of the Bankruptcy Code, with the proceeds therefrom to be used to pay Allowed Claims in accordance with the terms of the Plan.  .The Plan also provides for the creation of a Plan Trust to be administered by the Plan Trustee, subject to oversight by the Plan Trust Oversight Committee, that will be responsible post-confirmation for liquidating those assets of the Debtor that are contributed to the Plan Trust pursuant to the Plan and for making Distributions to Holders of Allowed Claims.

In consideration for the Debtor's contribution of certain non-Estate assets including the Restricted Funds toward the payment of Allowed Claims and the Baptist Entities' contribution of the Baptist Entities Plan Contribution to further enhance distributions to creditors, the Plan provides for releases of claims and causes of action that direct or beneficial holders of Claims against the Debtor (including any and all holders of beneficial interests in the Bonds) have or may have against the Debtor, the Debtor's trustees, officers, employees, and other representatives.  Those releases are material to the Debtor's Plan, without which the Debtor's Comprehensive Mediation Settlement Agreement cannot be implemented nor the Plan confirmed.  Creditors are encouraged to read carefully these release provisions, which are found in Article VIII of the Plan.

Prior to the Petition Date, the Debtor executed a Plan Support Agreement with (1) creditors holding beneficial interests in over $9.7 million in Claims against the Debtor and (2) the Baptist Entities, pursuant to which such creditors and the Baptist Entities pledged their support of the Plan. All or substantially all of those creditors and the Baptist Entities were parties to the Comprehensive Mediation Settlement Agreement that is the foundation of the Debtor's Plan. The Debtor believes confirmation of the Plan is in the best interests of all the Debtor's creditors as it will enhance recoveries through the addition of the Restricted Funds and the Baptist Entities Plan Contribution to the funds available to pay Allowed Claims of creditors.

### C. The Disclosure Statement

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims that are entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [DATE], at [___:___ __.m.], prevailing Central Time.

**The Debtor has filed additional pleadings with the Bankruptcy Court with respect to the materials for soliciting votes to accept or reject the Plan (collectively, the "Solicitation Materials"). All Creditors are advised and encouraged to read the Solicitation Materials and the Disclosure Statement Approval Order (as defined below) in their entirety.**

In connection with the solicitation of votes to accept or reject the Plan, holders of Claims entitled to vote on the Plan will receive, among other things:

- The Plan;

- An Order of the Bankruptcy Court (excluding the exhibits thereto) dated [DATE] (the "Disclosure Statement Approval Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan;

- The Solicitation Materials; and

- One or more Ballots, which will be used by holders of Claims that are entitled to vote on the Plan.

The Disclosure Statement Approval Order determines that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records…that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT <u>AND</u> THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION IT CONTAINS OR AN APPROVAL OF, OR AN ENDORSEMENT OF, THE MERITS AND FAIRNESS OF THE PLAN BY THE BANKRUPTCY COURT.**

The Disclosure Statement Approval Order establishes the deadlines, procedures and instructions for voting to accept or reject the Plan, for filing objections to confirmation of the Plan, for making any elections as provided thereon, the record date for voting purposes, and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions will accompany each Ballot.  Each holder of a Claim that is entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Approval Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### D.    Voting and Solicitation Procedures

On [DATE], the Debtor filed the Solicitation Materials with the Bankruptcy Court. The Solicitation Materials contain detailed information for holders of Claims in Classes of Claims that are entitled to vote to accept or reject the Plan.  The voting procedures provide substantially as follows:

### 1.    Creditors of Chapter 11 Debtor Entitled to Vote Generally

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold a Claim in more than one Class, you will receive separate Ballots that must be used for each separate Class.  After carefully reviewing the materials included herein and the instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.

### 2.    Voting Generally

In order for your vote to be counted, you must complete and sign your original Ballot and return it (only original signatures will be accepted) as instructed in the Ballots and other Solicitation Materials you received.

6

If you are a Bondholder who received a Ballot(s) from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution (each an "Institutional Nominee") promptly so that it can be forwarded to Globic Advisors, Inc. ("Solicitation Agent"), the Debtor's solicitation agent with respect to the Bonds, as appropriate.

All Ballot(s) for Claims in Class 3 (Bank Claims), Class 4 (Indemnity Claims), and Class 5 (General Unsecured Claims) must be returned directly to co-counsel for the Debtor at the following address:

> Alexandra Garrett, Esq.
> Silver Voit Garrett & Watkins P.C.
> Co-Counsel for the Debtor
> 4317-A Midmost Drive
> Mobile, AL 36609

More detailed instructions regarding how to vote on the Plan are contained on the Ballots and the other Solicitation Materials distributed to holders of Claims that are entitled to vote on the Plan.

**DO __NOT__ RETURN ANY DEBT INSTRUMENTS, NOTES, OR CERTIFICATES THAT YOU MAY HAVE WITH YOUR BALLOT(S).**

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY **RECEIVED** BY COUNSEL FOR **THE DEBTOR, OR THE SOLICITATION AGENT (AS APPLICABLE) NO LATER THAN 5:00 P.M., PREVAILING CENTRAL TIME, ON [DATE], 2024**.

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED FOR VOTING PURPOSES.

Pursuant to the Disclosure Statement Approval Order, the Bankruptcy Court set [DATE], 2024, as the record date (the "Voting Record Date") for voting on the Plan. Accordingly, only holders of record as of [DATE], 2024 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call counsel for the Debtor, Jay Bender and James Bailey of Bradley Arant Boult Cummings LLP, at 205-521-8000, or Alexandra Garrett of Silver Voit Garrett & Watkins, P.C., at 251-343-0800, or email Jay Bender (jbender@bradley.com), James Bailey (jbailey@bradley.com), or Alexandra Garrett (agarrett@silvervoit.com).

Bondholders may also direct inquiries regarding Ballots or the voting procedures generally to the Solicitation Agent, Globic Advisors, Inc., at (212) 227-9699.

Votes cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly.

### 3. Withdrawal or Change of Votes on the Plan

After the Voting Deadline, no vote may be withdrawn or changed without the prior consent of the Debtor, which consent shall be given in the Debtor's sole discretion.

Any holder of a Claim in Class 3 (Bank Claims), Class 4 (Indemnity Claims), and Class 5 (General Unsecured Claims) that has submitted prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to counsel for the Debtor, prior to the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that counsel for the Debtor determines was the last to be received.

Bondholders that have timely submitted a Ballot to their Institutional Nominee prior to any deadline set by the Institutional Nominee must follow the instructions from the Institutional Nominee regarding any amendment to such Bondholder's Ballot(s) or the vote therein.

### 4. Vote Required for Acceptance of the Plan by a Class

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Approval Order.

If you are a beneficial holder any of the Bonds, the Disclosure Statement Approval Order provides, consistent with the Comprehensive Mediation Settlement Agreement, that you shall be entitled to cast a Ballot with respect to the Bond Lease Claim. Accordingly, if you are a beneficial holder of any of the Bonds and you receive a Ballot from a bank, broker, agent or nominee (a "Voting Nominee"), in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee by the deadline set by such Voting Nominee so that the Voting Nominee can process your Ballot and transmit a master ballot to counsel for the Debtor so that it is actually received no later than the Voting Deadline. If you are the holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and returned to the counsel for the Debtor so that it is received no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtor.

THE DEBTOR INTENDS TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASE UNDER THE

CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

### 5. Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims Disclosure Statement Approval Order[1] in classes of claims that are impaired and entitled to receive distributions under the plan are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims are impaired but are not entitled to receive or retain any property on account of such claims are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

The following summarizes which Classes are entitled to vote on the Plan and which are not:

- The Debtor is seeking votes from the holders of Claims in Classes 2, 3, 4, and 5.

- The Debtor is not seeking votes from holders of Claims in Class 1 (Priority Non-Tax Claims) because those Claims are Unimpaired under the Plan, and the holders of Claims in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

- There are no equity interests in the Debtor and therefore no voting class of interests.

For a more detailed summary of the Classes of Claims and their treatment under the Plan, *see* Article VI below.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and represent more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, *see* Article VII below.

Should all classes of Claims not accept the Plan, the Debtor will seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. Under that section, a chapter 11 plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article VII below.

---

[1] As the Debtor is a non-profit corporation, there are no holders of equity interests in the Debtor. For that reason, the Disclosure Statement does not discuss the voting or treatment of equity interests.

### E. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [DATE] at [____ __].m. prevailing Central Time before the Honorable [INSERT], United States Bankruptcy Court, [INSERT LOCATION] (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [DATE], at 5:00 p.m., prevailing Central Time**, by the following parties:

**Counsel to the Debtor:**

Bradley Arant Boult Cummings LLP
1819 5th Avenue North
Birmingham, Alabama  35203
Attn:   Jay R. Bender
          James B. Bailey
Emails: jbender@bradley.com;
jbailey@bradley.com

Silver Voit Garrett & Watkins,
Attorneys at Law, P.C.
Alexandra Garrett
4317-A Midmost Drive
Mobile, AL 36609
Email: agarrett@silvervoit.com

**The Bankruptcy Administrator:**

Office of the United States Bankruptcy Administrator
Attn: Mark Zimlich
113 St. Joseph Street Suite 520
Mobile, AL 36602


### ARTICLE II.

### OVERVIEW OF THE PLAN

### A. Summary

The Plan contemplates the liquidation and distribution in accordance with terms of the comprehensive, global settlement agreement negotiated and agreed to by the Debtor and its most significant creditors, including the Banks, the Indenture Trustee, the Consenting Bondholders, the Indemnity Claimants, and the Baptist Entities.  The Comprehensive Mediation Settlement, as implemented by the Plan, will provide for the wind-down of the

Debtor's operations and the disposition of substantially all of the Debtor's remaining property of the Estate in accordance with Chapter 11 of the Bankruptcy Code.

The Plan provides for the distribution to holders of Allowed Claims not only of the proceeds of substantially all property of the Debtor's Estate, but also of the net proceeds of the Debtor's Restricted Funds that are not property of its Estate. Pursuant to the Comprehensive Mediation Settlement Agreement, the Debtor agreed to make the Restricted Funds available conditionally to pay certain Allowed Claims of creditors contingent upon confirmation of this Plan. As of the Petition Date, the total amount of the Debtor's Restricted Funds is approximately $7 million. Pursuant to the Plan, the Restricted Funds will be used first, to fund the Debtor's professional fees and to fund the wind-down of its current operations and its Chapter 11 Case. The next $400,000 shall be disbursed to the Foundation, a 501(c)(3) corporation formed under the laws of the State of Alabama. Finally, all Restricted Funds remaining thereafter, which the Debtor believes should exceed $6 million in total, shall be paid to the holders of Allowed Claims in Classes 2 and 3. The Debtor's Board of Trustees believes that the use of the Restricted Funds to help pay creditor claims in accordance with the terms, and subject to confirmation, of the Plan is a good and proper use of such funds consistent with the Christian and educational missions of the Debtor.

In addition, the Plan provides for the payment to creditors of certain funds furnished by the Baptist Entities that will allow the Debtor to enhance Plan distributions to the Debtor's creditors. On or before the Effective Date of the Plan, the Baptist Entities shall pay the Baptist Entities Plan Contribution, with the proceeds of the Baptist Entities Plan Contribution to be distributed to holders of Allowed Class 2 Claims in accordance with the terms of the Plan.

To facilitate the liquidation of the Debtor's assets and the distribution of all monies to be distributed pursuant to the Plan (including the Restricted Funds to be paid to holders of Allowed Claims and the Baptist Entities Plan Contribution), the Plan provides for the creation of a Plan Trust. The Plan Trust will be administered by the Plan Trustee, subject to oversight by the Plan Trust Oversight Committee.

As part of the Comprehensive Mediation Settlement Agreement that is the foundation of this Plan, in consideration for the contribution of the non-Estate assets including the Restricted Funds and the Baptist Entities Plan Contribution, the Plan provides for releases of claims and causes of action that the Debtor's creditors (including any and all holders of beneficial interests in the Bonds issued for the Debtor's benefit) have or may have against the Debtor, the Debtor's past and present trustees, officers, employees, and other representatives. Those releases are material to the Debtor's Plan, without which the Debtor's Comprehensive Mediation Settlement Agreement cannot be implemented nor the Plan confirmed. Creditors should review carefully these third-party release provisions, which are found in Article VIII of the Plan. The Debtor believes that the Plan will enable it to implement its settlement, to wind-down the present operations of the Debtor, and to accomplish the objectives of Chapter 11.

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document   Page 13 of 160

Administrative Claims and priority claims against the Debtor shall be paid in cash in full.  In addition, the Plan provides for the treatment of other Allowed Claims against the Debtor as detailed below.

**B.**      **Summary of Classification and Treatment of Claims and Interests under the Plan**

The following chart summarizes the projected distributions to holders of Allowed Claims against the Debtor under the Plan.  Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only estimates.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtor to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement.  The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims as well as other factors related to the liquidation of the Debtor's Estate.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against the Debtor.  The Debtor urges all Creditors to read the Risk Factors in Article VIII of this Disclosure Statement.

The following chart summarizes the anticipated recoveries for holders of Allowed Claims under the Plan.  THE EXPECTED RECOVERIES SET FORTH BELOW ARE FOR ILLUSTRATIVE PURPOSES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.

### SUMMARY OF ANTICIPATED RECOVERIES UNDER THE PLAN

| Class | Claims and Interests | Status | Voting Rights | Projected Recovery Under the Plan |
|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 2 | Bond Lease Claim | Impaired | Entitled to Vote | [TBD] |
| Class 3 | Bank Claims | Impaired | Entitled to Vote | [TBD] |
| Class 4 | Indemnity Claims | Impaired | Entitled to Vote | [TBD] |

12

| Class | Claims and Interests | Status | Voting Rights | Projected Recovery Under the Plan |
|-------|---------------------|--------|---------------|----------------------------------|
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote | [TBD] |

## ARTICLE III.

## DEBTOR'S BACKGROUND

### A.    History

The Debtor was founded as a liberal arts college for women in 1838 by members of the Siloam Baptist Church in Marion, Alabama. At a time when higher education for women was limited, the founders sought to establish a school for young women that would provide them with the same quality of education that young men received.  As such, the Debtor is the oldest women's college in Alabama, and is also one of the oldest women's colleges in the United States.   The Debtor has been committed to providing quality undergraduate instruction, building leadership skills, strengthening faith, and preparing women for ever-expanding roles in society.

The Debtor historically operated its college operations on an 80-acre campus located in the town of Marion in southwest Alabama.  Campus facilities include Jewett Hall (administration, dining hall, Harrison Center for Academic Excellence, Ramsay-McCrummen Chapel), Woman's Missionary Union residence hall, Kirtley and Barron residence halls, Bean Hall (Alabama Women's Hall of Fame, history and political science departments), Alumnae Auditorium and Tucker Hall (fine arts center), Archibald Hall dining and conference center, Mead Hall and Lowder Science Center (academic classroom buildings), Riddle Gymnasium, Bowling Library, Blount Student Union, Crawford riding arena, Piper Equestrian Center, club house, and Dunkin Athletic Park.

### B.    Relationship to the Convention

Since 1843, the Debtor has been one of those entities whose ministries are fostered by the Alabama Baptist State Convention (the "Convention"), whose work is financially supported by the Convention, and whose ministries received the Convention's encouragement and nurture. During this time, the Convention contributed financial support to Debtor's academic operations and elected persons to serve on the College's Board of Trustees.  The State Board of Missions of the Alabama Baptist State Convention (the "State Board of Missions") is the administrative and promotional agency of the Convention and recommends proposed goals and objectives for raising and distributing funds.  The churches that voluntarily contribute to the Convention provide funds for the Convention's support of Christian education and other benevolent causes.   Prior to the Debtor suspending its academic operations in 2021, the Debtor had been receiving approximately $1 million per year through the Convention towards the Debtor's budget.

### C. Management of the Debtor

#### 1. Board of Trustees and Steering Committee

The Judson Board of Trustees is the governing body of the Debtor. As of the Petition Date, the Board of Trustees consists of the following members:

- Roy Barnett, Jr
- Arthur Mead Britton
- Jackie Brunson
- David Byrd
- Patricia B. Compton
- Carol Crain
- Ed Cruce
- Daveta Dozier
- Charles Dunkin
- Judith Favor
- Bruce Fuller
- Doug Halbrooks
- Neal Isbell
- Richard Kirkpatrick
- Gregg Morrison
- Joan Newman
- Daphne R. Robinson
- James Sanford
- Anne Shumaker
- Leigh Wiatt
- Roger Willmore
- Gary Wyatt

The current Board officers on the Board are Dr. Joan Newman, Chair; James Sanford, Vice Chair; and Dr. Daveta B. Dozier, Secretary.

In 2021, the Board of Trustees appointed a steering committee authorized to oversee the Debtor's wind-down of its academic operations and negotiations with the Debtor's creditors (the "Steering Committee"). As of the Petition Date, the members of the Steering Committee were Doug Halbrooks, Dr. Joan Newman, Daphne R. Robinson, and James Sanford.

#### 2. Executive Officers

The Debtor is managed by its executive officers who serve at the direction of the Board of Trustees. As of the Petition Date, the Debtor's executive officers are Daphne R.

Robinson and Charlotte S. Clements, who serve as President and Vice President, respectively.

### D. The Debtor's Assets

As more specifically detailed in the Debtor's Schedules of Assets on file with the Bankruptcy Court, the Debtor owns few assets, consisting primarily of limited cash on hand, *de minimis* real estate holdings, and various unliquidated claims and causes of action against various parties. As more particularly described below, although the Debtor does have possession of certain donor-restricted endowment funds, those funds do not constitute property of the Debtor's Estate due to the use restrictions placed on such funds. The Restricted Funds are described in greater detail immediately below.

### E. The Debtor's Restricted Funds

The Debtor holds certain endowment funds (collectively, the "Restricted Funds") that are subject to donor-imposed restrictions contained in gift instruments on the use of such funds. Because the Debtor holds these funds subject expressly to donor-created restrictions, these funds are not generally available to pay claims of the Debtor's creditors, nor do those funds constitute property of the Debtor's Estate under Section 541 of the Bankruptcy Code. As of the Petition Date, the Debtor held approximately $7 million in Restricted Funds in its endowment account.

Prior to the Petition Date, the Debtor obtained the conditional agreement of certain donors to modify the restrictions on their gifts to the College to allow the College to use their gifts to fund its ongoing operational expenses and professional fees, which gifts have a cumulative approximate balance as of February 28, 2023 of $806,383 (the "Donor Conditionally Available Funds").

As more specifically described in Section IV(E) below, the Debtor recently obtained entry of the UPMIFA Order, conditionally authorizing the Debtor to use the Restricted Funds to help pay the Allowed Claims of creditors, subject to confirmation of the Plan by the Bankruptcy Court.

### F. The Debtor's Prepetition Debts

The Debtor's debt liabilities primarily consist of a bond lease and unsecured credit lines and notes owing to local banks. A summary of the Debtor's most significant liabilities is provided below.

#### 1. Bond Lease Claim

On or about October 1, 2010, The Educational Building Authority of the City of Marion (the "Authority") issued its Revenue Bonds, Judson College Series 2010, dated as of October 1, 2010 (the "Bonds" and the claim related thereto, the "Bond Lease Claim"), pursuant to that certain Trust Indenture dated as of October 1, 2010 (as further amended, supplemented or otherwise modified from time to time, the "Bond Indenture") by and among

the Authority, as issuer, and Regions Bank, as indenture trustee (in such capacity, the "Indenture Trustee").  Simultaneously with the issuance of the Bonds, the Authority, as sub-lessor, and the Debtor, as sub-lessee, entered into a Lease Agreement (the "Bond Lease") pursuant to which the Authority leased Jewett Hall, the Science Center, and the Women's Missionary Union Residence Hall (the "Leased Facilities") to the Debtor.  In order to provide a basis for the Bond Lease, the Debtor leased the land on which the Lease Facilities are located to the Authority under a ground lease dated as of October 1, 2010 (the "Ground Lease").

The Bonds are limited obligations of the Authority payable solely from the rent to be paid by the Debtor under the Bond Lease.  Payment of the Bonds was secured by a pledge and assignment to the Indenture Trustee of the Bond Lease under the Bond Indenture. Payment of the Bonds is also secured by a pledge by the Debtor in the Bond Lease of the tuition and other fees payable by or on behalf of students enrolled with the Debtor, as more fully described in the Bond Lease.

In May, 2023, the Indenture Trustee and the Banks released any interests they had or may have had in the Campus Property (including any interests arising out of the Bond Lease) in consideration for the payment of $850,000 to the Indenture Trustee and $150,000 to the Banks.  Contemporaneously therewith, the Debtor conveyed the Campus Property to the Foundation.  The May 2023 transaction was consummated after the Debtor had marketed the Campus Property for sale for approximately two years without receiving any credible offers to purchase the Campus Property or any portion thereof.  The Indenture Trustee retains its Bond Lease Claim against the Debtor.

As of the Petition Date, the outstanding principal amount owed on the Bonds is $9,030,000, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue.

## 2. Marion Bank Claim

The Debtor is the obligor on two promissory notes made to the order of Marion Bank & Trust ("Marion Bank"), as the same have been modified from time to time thereafter.  As of the Petition Date, the outstanding principal balance owed to Marion Bank is $2,534,484.81, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "Marion Bank Claim").

## 3. FCB Claim

The Debtor is the obligor on an unsecured credit line agreement made to the order of First Cahawba Bank ("FCB"), as the same have been modified from time to time thereafter. As of the Petition Date, the outstanding principal balance owed to FCB is $921,790.47, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "FCB Claim").

### 4. West Alabama Bank Claim

The Debtor is the obligor on a promissory note dated February 12, 2021, made to the order of West Alabama Bank & Trust ("West Alabama Bank"), as the same has been modified from time to time thereafter. As of the Petition Date, the outstanding principal balance owed to West Alabama Bank is $1,610,207.19, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "West Alabama Bank Claim").

## ARTICLE IV.

## EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

### A. The Debtor Suspends Academic Operations

As a not-for-profit institution of higher learning, the Debtor has relied upon student tuition and related fees and donations to fund its educational mission. Unfortunately, the Debtor experienced declining enrollment over the past two decades and the tuition, fees and donations were not sufficient to fund the Debtor's operating expenses.

In recent years, tuition brought in approximately $14,000 per student per academic year. But based on enrollment in 2020, the cost to operate the College was approximately $40,000 per student per academic year.

As of December 2020, the Debtor had only 145 students enrolled, and only 80 students registered for the Fall 2021 semester. The approved budget for the 2021-2022 academic year that would begin June 1, 2021 was approximately $9.1 million.

Recognizing that the Debtor would not be able to meet its budget for the 2021-2022 academic year, beginning in December 2020, the Debtor made an appeal to supporters for donations. As a result of these efforts, the Debtor received approximately $3.7 million in new donations, which made it possible for the Debtor to complete its 2020-2021 academic year. However, the Debtor needed commitments of at least $5 million to satisfy operating expenses and debt service for the 2021-2022 academic year.

Accordingly, on May 6, 2021, the Debtor's Board of Trustees voted to suspend academic operations of the 183-year-old institution. The Board of Trustees also appointed the Steering Committee to work with school officials and hired counsel to advise regarding the wind-down the Debtor's academic operations in an honorable fashion by addressing its financial liabilities.

### B. Prepetition Litigation and Indemnity Demands

### 1. Banks Lawsuit

On September 19, 2022, West Alabama Bank, Marion Bank, and FCB (collectively, the "Banks") filed a consolidated complaint against the Debtor in the Circuit Court of Perry County, Alabama (CV-2022-900037.00) (the "Banks Lawsuit") seeking a judgment for

breach of the Banks' respective promissory notes in the principal amount of the Bank Claims.

On October 31, 2022, the parties filed a Joint Motion to Stay the Banks lawsuit pending mediation and potential settlement. The state court entered an order staying the case on October 31, 2022. There has been no further activity in the case. As discussed further below, the Debtor, the Banks, and others entered into the Comprehensive Mediation Settlement Agreement to resolve the Banks Lawsuit. The Plan implements the parties' settlement.

### 2. Indenture Trustee Lawsuit

On September 19, 2022, the Indenture Trustee filed a complaint against the Debtor in the Circuit Court of Perry County, Alabama (CV-2022-900040.00) (the "Indenture Trustee Lawsuit") seeking entry of a judgment for the breach of the Bond Documents. The Indenture Trustee Lawsuit seeks a judgment against the Debtor for the principal balance of the accelerated Bond Lease Claim. The Indenture Trustee Lawsuit also seeks a declaratory judgment that the Indenture Trustee has an interest in the Debtor's general endowment fund that is "senior to" the interests of the Educational Authority of the City of Marion, the Debtor, or the Banks.

On October 31, 2022, the parties filed a Joint Motion to Stay the Indenture Trustee Lawsuit pending mediation and potential settlement. The state court entered an order staying the case on November 1, 2022. There has been no further activity in the case. As discussed further below, the Debtor, the Indenture Trustee, and others entered into the Comprehensive Mediation Settlement Agreement to resolve the Indenture Trustee Lawsuit. The Plan implements the parties' settlement.

### 3. Mann Lawsuit

On July 15, 2022, Mr. Frank Mann ("Mr. Mann"), a beneficial holder of certain of the Bonds, filed a complaint in the Circuit Court of Jefferson County, Alabama (CV-2022-902060) (the "Mann Lawsuit") against certain of the Debtor's trustees and past and present officers (namely, Charles F. Dunkin, Roy A. Barnett, Jr., Daphne R. Robinson, Bruce Fuller, Joseph W. Mathews, Jr., Judith K. Favor, and Joan Newman) as well as the Convention and its executive director, Rick Lance. Mr. Mann asserted various claims for fraud, deceit, violations of Alabama Securities Act, and declaratory relief pertaining to certain disclosures and alleged omissions in connection with the issuance of the Bonds. Mr. Mann filed a First Amended Complaint on September 7, 2022, adding the State Board of Missions as a defendant. On September 14, 2022, Mr. Mann filed a Second Amended Complaint against the same defendants.

The Debtor was not named as a defendant in the Mann Lawsuit; however, the assertion of Mr. Mann's claims against the Debtor's trustees and officers triggered certain statutory and contractual indemnification obligations the Debtor owed to those named defendants. The College, along with the named defendants in the Mann Lawsuit,

vehemently dispute the allegations made in the Mann Lawsuit and have vigorously defended against the claims asserted therein.

On September 29, 2022, the defendants filed a motion to dismiss asserting an array of arguments and defenses for the dismissal of the Bondholder Litigation. Mr. Mann opposed the motion to dismiss. On December 7, 2022, the trial court entered an order dismissing the Mann Lawsuit without prejudice. On December 12, 2022, Mr. Mann, along with new co-plaintiffs First Bank of Alabama, FirstState Bank, First Bank of Boaz, and Alabama One Credit Union (who are holders of 2010 Bonds), filed a Third Amended Complaint against the same defendants and added one additional Judson trustee as a defendant, James Sanford. The Third Amended Complaint also added purported class action claims.

On March 31, 2023, the parties filed a Joint Motion to Stay the Mann Lawsuit pending settlement. The state court entered an order staying the case on April 3, 2023. There has been no further activity in the case. As discussed further below, the Debtor, the plaintiffs in the Mann Lawsuit, and others entered into the Comprehensive Mediation Settlement Agreement to, among other things, resolve the Mann Lawsuit.

### 4. Indemnity Claims

Certain individual defendants in the Mann Lawsuit have asserted Indemnity Claims against the Debtor. As discussed further below, the Debtor, the Indemnity Claimants, and others entered into the Comprehensive Mediation Settlement Agreement to, among other things, resolve the Indemnity Claims.

### 5. Insurance Coverage Lawsuit

On July 17, 2023, the Debtor and certain of the defendants named in the Mann Lawsuit (namely, Joan Newman, Judith K. Favor, Daphne R. Robinson, Joseph W. Matthews, Jr.), filed a complaint in the Circuit Court of Perry County, Alabama (CV-2023-900035) (the "Insurance Coverage Litigation") against Indian Harbor Insurance Company, Ken Goforth, and USI Insurance Services. The complaint asserts claims for breach of contract, bad faith failure to defend and indemnify, and negligence arising out of Indian Harbor Insurance Company's denial of defense and insurance coverage to the plaintiffs in connection with their defense of the Mann Lawsuit. Indian Harbor Insurance Company had issued to the Debtor an Educators Legal Liability and Employment Practices Liability policy of insurance for the policy period of January 1, 2021 through January 1, 2022.

On August 21, 2023, Indian Harbor removed the Insurance Coverage litigation to the United States District Court for the Southern District of Alabama, where it was assigned case number 23-cv-00315.

The Debtor and the other plaintiffs in the Insurance Coverage Litigation have negotiated a settlement of their claims with the defendants in that action. The Debtor is preparing a motion to approve that settlement to file with the Bankruptcy Court disclosing

the terms thereof, which settlement shall be contingent upon the occurrence of the Effective Date of the Plan.

### 6. Faulkner Trust-Trustmark Litigation

On October 18, 2022, Trustmark National Bank ("Trustmark"), in its capacity as Trustee of the Bonnie F. Faulkner Charitable Trust (the "Faulkner Trust") created under the Last Will and Testament of Bonnie F. Faulkner dated February 15, 2002, filed a "Petition to Confirm Substitution of Beneficiary" in the Circuit Court of Tuscaloosa County, Alabama (CV-2022-900884) (the "Faulkner Trust-Trustmark Litigation"). The Petition to Confirm Substitution of Beneficiary seeks a judicial modification of the terms of the Faulkner Trust to redirect the Debtor's share of the Faulkner Trust, which equals 68.92% of the Faulkner Trust funds, to the University of Mobile. The Debtor opposes the Petition to Confirm Substitution of Beneficiary and, on December 5, 2022, the Debtor filed a counterclaim against Trustmark for breach of fiduciary duty. Trustmark filed a motion to dismiss the counterclaim, but the state court denied the motion to dismiss on August 6, 2023. The Indenture Trustee has intervened in the litigation and asserted entitlement to the proceeds of the Faulkner Trust funds if allocable to the Debtor.

Prior to the Petition Date, the Debtor settled the Faulkner Trust-Trustmark Litigation in consideration for one lump-sum settlement payment. The terms of the settlement are confidential, but were reviewed and approved by certain of the Debtor's creditors in accordance with the terms of the Comprehensive Mediation Settlement Agreement.

### 7. The Liver Trust-Robertson Banking Litigation

On March 16, 2023, the Debtor filed a complaint in the Circuit Court of Perry County, Alabama (CV-2023-900010) (the "Liver Trust-Robertson Banking Litigation") against Robertson Banking Company, as Trustee for the Elizabeth C. Liver Testamentary Trust (the "Liver Trust"). The Debtor is named as a beneficiary of the Liver Trust. The Debtor did not receive any distributions from the Liver Trust in 2021 or 2022. The Debtor thereafter learned that Robertson Banking Company, as Trustee for the Liver Trust (the "Liver Trustee"), had reassigned the Debtor's beneficial interest in the Liver Trust to other recipients without notice to or permission of the Debtor. The Debtor's complaint in the Liver Trust-Robertson Banking Litigation case asserts a claim for breach of fiduciary duty and various remedies against the Liver Trustee.

On April 12, 2023, the Liver Trustee filed a motion for transfer of venue to Marengo County, Alabama. The Debtor opposed the motion for transfer of venue. The motion remains pending with the state court. On July 21, 2023, the state court ordered the parties to participate in a mediation to attempt to settle the Liver Trust-Robertson Banking Litigation.

The mediation was held on October 31, 2023, at which the parties negotiated a settlement agreement. The terms of the settlement are confidential, but were reviewed and approved by certain of the Debtor's creditors in accordance with the terms of the

Comprehensive Mediation Settlement Agreement. Pursuant to the settlement of this litigation, the Debtor and the Debtor's estate shall receive a stream of payments over time in full settlement of its claims. Upon confirmation of the Plan, the Debtor's rights to receive any and all further settlement payments shall be assigned to the Plan Trust.

### C. Comprehensive Mediation Settlement Agreement

In January 2023, over the course of three days, the Debtor, the Banks, the Indenture Trustee, the Consenting Bondholders (who collectively hold over 60% of the beneficial interests in all the Bonds), the Indemnity Claimants and the Baptist Entities all participated in a mediation in Birmingham, Alabama. Serving as mediator was C. Edward Dobbs, a partner in the Atlanta law firm of Parker Hudson Rainer & Dobbs LLP. As a result of the mediation, the parties entered into the Comprehensive Mediation Settlement Agreement dated March 24, 2023, executed by the Debtor, the Indenture Trustee, the Consenting Bondholders, the Banks, the Indemnity Claimants, the Convention, the State Board of Missions, and the Baptist Foundation. A copy of the Comprehensive Mediation Settlement Agreement is attached hereto as <u>Exhibit B</u>.

The Comprehensive Mediation Settlement Agreement contemplated a chapter 11 filing by the Debtor, and the Comprehensive Mediation Settlement Agreement is itself contingent upon confirmation of a chapter 11 plan for the Debtor to implement the parties' settlement, including the third-party releases described in the Comprehensive Mediation Settlement Agreement. As contemplated by the Comprehensive Mediation Settlement Agreement, the parties to that settlement each executed and delivered prior to the Petition Date a plan support agreement (the "<u>Plan Support Agreement</u>"), a copy of which is attached hereto as <u>Exhibit C</u>. The Plan Support Agreement evidences the parties' agreement to support confirmation of the Plan in order to implement their settlement negotiated through mediation.

Following is a summary of the material terms of the Comprehensive Mediation Settlement Agreement:

- With respect to the Debtor's Restricted Funds, the Debtor agreed to file an application pursuant to Alabama's version of the Uniform Prudent Management of Institutional Funds Act ("<u>UPMIFA</u>") seeking the entry of an order authorizing the Debtor's conditional use of those funds, which totaled over $7.3 million as of May 31, 2023, to distribute to certain creditors of the Debtor, subject to confirmation of a chapter 11 plan of the Debtor. The Restricted Funds would be used as follows (a) first, to pay (i) the Debtor's reasonable professional fees and expenses, whenever incurred, (ii) its reasonable operating and winddown expenses, and (iii) its obligations to pay Indemnity Claims that were incurred prior to the full execution of the Comprehensive Mediation Settlement Agreement, (b) second, in furtherance of the Debtor's historical charitable

mission, $400,000^2$ to the Foundation on the Effective Date of the Plan, and (c) the Debtor's remaining debts and obligations, including its debts and obligations to the Banks and the Indenture Trustee (for the benefit of the Bondholders), in accordance with the terms of the Plan as confirmed. The Comprehensive Mediation Settlement Agreement provided generally that the Restricted Funds, as well as any recoveries from the External Trusts (as described below) would be disbursed to the Debtor's creditors as follows: (1) first, a distribution to the Indenture Trustee to cover its actual fees and expenses incurred as a result of the defaults under the Bonds up to a maximum amount of $700,000; and (2) second, the remaining balance disbursed as follows: (A) 75.0% to the Indenture Trustee for the benefit of the Bondholders and disbursed by the Indenture Trustee in accordance with the terms and priorities of the Bond Indenture; and (B) 25.0% to the Banks, to be allocated among them on a pro rata basis or as otherwise agreed among them.

- The Baptist Entities agreed to pay, on the Effective Date, the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) to the Debtor, with $400,000 of that amount to be paid to the Indenture Trustee for distribution in accordance with the terms of the Bond Indenture and the remaining $350,000 of that amount to be paid to the Bondholders Committee Counsel.

- Upon the Effective Date of the Debtor's chapter 11 plan, the Debtor would convey title to substantially all of its remaining (including all claims and causes of action of the Debtor not released by the Plan or otherwise, including the Accountant Claims and any and all claims against any External Trusts) to a plan trust (the "Plan Trust") created for the benefit of the Debtor's creditors. The trustee of the Plan Trust (the "Plan Trustee") will be selected by the Debtor and mutually acceptable to the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks. The Plan Trustee shall liquidate any and all such assets in the Plan Trust and disburse the net proceeds therefrom pursuant to the Plan. The net proceeds of any recoveries on any Retained Accountant Claims shall be paid to the Indenture Trustee for the benefit of the Bondholders. Otherwise, the net proceeds derived from all other causes of action of the Debtor's Estate would be distributed ratably to creditors.

- In consideration for the payment of $1,000,000 in cash to them, the Indenture Trustee, the Consenting Bondholders, and the Banks agreed to the Debtor's conveyance to the Foundation of all the real and personal property that comprised its campus in Marion, Alabama (the "Campus Property") and to the release of any liens, claims, or encumbrances on the Campus Property that any of them had

---

[2] Pursuant to the Plan, this amount shall be decreased by any amounts expended by the Debtor since the conveyance of the Campus Property to the Foundation for the maintenance, security, and insurance of, and utilities furnished to, the Campus Property (to the extent not previously reimbursed by the Foundation), plus interest thereon at a fixed rate of five percent (5.0%) per annum. *See* Plan, § IX.A(v).

or may have had on such property. The proceeds from this transaction were split among the Indenture Trustee and the Banks as follows: (a) fifteen percent (15.0%) to the Banks, to be allocated among them on a pro rata basis (or as otherwise agreed among them) and applied against their outstanding loans; and (b) the remaining eighty-five percent (85.0%) of the funds to the Indenture Trustee for disbursement in accordance with the terms of the Bond Indenture.

- The Consenting Creditors each agreed to forbear from exercising any rights and remedies against the College or any of its property and from filing or causing to be filed (either directly or indirectly) or otherwise pursuing any claims, causes of action, subpoenas, depositions, or discovery against the Debtor or any of its past or present officers, trustees, directors, employees, attorneys, agents, or representatives, through the earlier to occur of (a) March 31, 2024 and (b) the date on which one of the conditions precedent to the effectiveness of the Plan Support Agreement is not satisfied unless such compliance with such condition is waived by the Consenting Creditors (the "<u>Forbearance Period</u>").  In furtherance of the foregoing, the pending lawsuits filed by the Banks, the plaintiffs in the Mann Lawsuit, and the Indenture Trustee are stayed until the end of the Forbearance Period.

- On the Effective Date, the College would transfer to the Foundation certain archival and historical items regarding the College of *de minimis* value,

- Subject to the occurrence of the Effective Date of the Plan, the Indemnity Claimants agreed to waive and release any and all Indemnity Claims against the Debtor.

- The Plan and Confirmation Order shall contain, effective as of the Plan Effective Date: (A) comprehensive, global releases of (1) all claims and causes of action of the Debtor and its past and present trustees and officers (other than the Retained Claims) against any and all of the Bondholders, the Indenture Trustee, the Banks, the Baptist Entities, the External Trusts for which the Baptist Foundation serves as Trustee, their insurer(s), and each of their respective affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, (2) all claims and causes of action of any creditors (including all past and present Bondholders, the Indenture Trustee, the Banks, and the Baptist Entities) against the Debtor, its past and present trustees, officers, directors, employees, attorneys, consultants, agents, representatives, any entities that have issued bonds for the benefit of the Debtor, successors, and assigns, in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bonds, the Indenture, the Bond Lease, the Bank Claims, the Indemnity Claims, any other Bond document, or the claims asserted or that could have been asserted in the Mann Lawsuit, the Indenture Trustee Lawsuit, or the Banks Lawsuit, (3) all claims and causes of action of any creditors (including all past and present Bondholders, the Indenture Trustee, and the Banks) against each of the Baptist Entities, the External Trusts for which the Baptist Foundation

serves as Trustee, their insurer(s), and each of their respective affiliates, trustees, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bank Claims, the Indemnity Claims, the External Trusts for which the Baptist Foundation serves as Trustee, or the claims asserted or that could have been asserted in the Mann Lawsuit, (4) all claims and causes of action between or among the holders of any of the Bonds and the Indenture Trustee, on the one hand, and the Banks, on the other, in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bank Claims, the Indemnity Claims, or the claims asserted or that could have been asserted in the Mann Lawsuit, (5) all claims and causes of action of any past or present Bondholders against the Indenture Trustee, its affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors and assigns, in any way related to or arising out of (whether directly or indirectly) the Bond Lease Claim, the Bonds, the Indenture, the Bond Lease, or any other Bond document, including but not limited to, claims for any action or inaction pertaining to their services for the Indenture Trustee and arising out of and directly or indirectly related to or connected with the compliance by the Indenture Trustee with the Comprehensive Mediation Settlement Agreement or in taking or not taking the direction of the Consenting Bondholders therein, (6) all claims and causes of action of the Debtor trustees, officers, directors, employees, attorneys, consultants, agents, representatives, successors and assigns named in the Mann lawsuit against the Baptist Entities, the External Trusts for which the Baptist Foundation serves as Trustee, their insurer(s), and each of their respective affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, and (7) all claims and causes of action of each of the Baptist Entities, and their respective past and present trustees, officers, and directors against the Indenture Trustee, the Consenting Bondholders, and the Banks in any way related to or arising out of (whether directly or indirectly) the Bond Lease Claim, the Bonds, the Bond Lease, the Indenture, or any of the Bank Claims. As these releases are a material part of the Comprehensive Mediation Settlement Agreement and to be made the foundation of the Plan, the releases shall be binding on all proposed parties thereto and the Plan shall not provide for any opt-outs.

- The Plan shall further provide for the release of all preference and other "avoidance actions" of the Debtor's bankruptcy estate against the Indenture Trustee, the Bondholders, the Banks, the Baptist Entities and their insurer(s), the External Trusts for which the Baptist Foundation serves as trustee, the Judson Foundation, the Parker, Hudson, Rainer and Dobbs, L.P. law firm of the mediator Ed Dobbs, and all of the Debtor's past and present trustees, officers, directors, employees, attorneys, accountants, other agents and representatives.

- The Plan shall <u>not</u> provide for the release of any claims or causes of action of the Debtor, the Bondholders, the Indenture Trustee, the Banks, or any other party

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document      Page 26 of 160

against (i) the External Trusts and the trustees of such External Trusts (including Trustmark Bank as trustee and Robertson Banking Company as trustee), other than those External Trusts for which any of the Baptist Entities serves as trustee, (ii) the accountants and accounting firms (the "<u>College Accountants</u>") who have performed work for the College, Jo Anne Morina CPA, Haynes Downard, LLP, and Brannum CPA (the "<u>Retained Accountant Claims</u>"), or (iii) the College's insurers (including without limitation Indian Harbor Insurance Company or AXA XL), all of which claims and causes of action (collectively, the "<u>Retained Claims</u>") shall be specifically retained and reserved and shall vest in the Plan Trust on the Plan Effective Date.

- Upon the Effective Date, the Banks, the Indenture Trustee, and the plaintiffs in the Mann Lawsuit shall all cause their pending lawsuits to be promptly dismissed with prejudice as against all defendants therein, each party to bear its own fees and costs.

Again, the above is simply a summary of the key terms of the Comprehensive Mediation Settlement. Creditors are encouraged to read the Comprehensive Mediation Settlement Agreement for a full and complete understanding of that agreement.

### D. Campus Property Transaction

As mentioned above, as part of the Comprehensive Mediation Settlement Agreement, the Consenting Creditors agreed that the Debtor may convey the Campus Property and to the release of any liens, claims, or encumbrances on the Campus Property in consideration for the Campus Property Release Amount.

In May 2023, in accordance with the Comprehensive Mediation Settlement Agreement, the Debtor conveyed the Campus Property to the Judson College Foundation, an Alabama non-profit corporation (the "<u>Foundation</u>") and the Consenting Creditors, in exchange for the Campus Property Release Amount, released all liens, claims and encumbrances with respect to the Campus Property. Pursuant to the terms of the Comprehensive Mediation Settlement Agreement, the Debtor disbursed the Campus Property Release Amount to the Indenture Trustee and the Banks as follows: (a) fifteen percent (15.0%) to the Banks; and (b) eighty-five percent (85.0%) of the funds to the Indenture Trustee for disbursement in accordance with the terms of the Bond Indenture.

The Debtor and the Foundation are continuing post-closing due diligence to confirm that all real and personal property that constitutes the Campus Property was fully conveyed to the Foundation. To the extent that any Campus Property was not duly conveyed to the Foundation prior to the Petition Date, the Plan provides that such residual property will vest in the Reorganized Debtor on the Effective Date, after which date such property (if any) shall be conveyed to the Foundation consistent with the Comprehensive Mediation Settlement Agreement.

### E. UPMIFA Action

Another material provision of the Comprehensive Mediation Settlement Agreement requires the Debtor to file an application pursuant to Alabama's version of the Uniform Prudent Management of Institutional Funds Act ("UPMIFA") seeking the entry of an order authorizing the Debtor's conditional use of Restricted Funds to fund the payment of allowed creditor claims under the Debtor's confirmed Plan.

On July 11, 2023, the Debtor filed its UPMIFA application in the Circuit Court of Perry County, Alabama (CV-2023-900034.00) (the "UPMIFA Action"). In the UPMIFA Action, the Debtor requested that certain restricted gifts with a total cash value of approximately $7.3 million be made available to pay a portion of the Debtor's debt obligations, related professional fees, and avoid protracted litigation with its creditors. Among other things, the Debtor submitted that since it had ceased all educational operations, the charitable purposes of the restricted gifts had become "impracticable, impossible to achieve, wasteful, [and] because of circumstances not anticipated by the donor, a modification of a restriction will further the purposes of the fund." Ala. Code § 19-3C-6(c).

On August 3, 2023, the Alabama Attorney General filed a Notice of No Opposition to the relief requested in the UPMIFA Action.

On August 4, 2023, the Circuit Court of Perry County, Alabama entered its order (the "UPMIFA Order") granting the relief requested in the UPMIFA Action, and ordered that the Restricted Funds may be expended as follows:

    i.    First, to the extent the Debtor does not have sufficient funds to pay such costs from its currently unrestricted assets and any available Donor Conditionally Available Funds (as defined in the Comprehensive Mediation Settlement Agreement), for timely payment of the Debtor's reasonable professional fees and expenses, reasonable operating and winding down expenses, and any unpaid obligations to pay indemnity claims incurred prior to the date of the Comprehensive Mediation Settlement Agreement;

    ii.    Second, $400,000 of the funds in the Debtor's endowment to be transferred to the Foundation to maintain, protect and preserve the Campus Property in Marion, Alabama and support the ongoing mission of the Debtor in the Marion, Alabama community; and

    iii.    Third, for all of the remaining funds in the Debtor's endowment after the payments described in (i) and (ii) above to be paid to the Bondholders and the Banks to be divided in accordance with their agreed-on percentage share as set forth in the Comprehensive Mediation Settlement Agreement.

The deadline to file an appeal of the UPMIFA Order under Alabama law has passed and no party has filed an appeal. Accordingly, the Debtor has filed its voluntary petition for

relief under chapter 11 of the Bankruptcy Code as contemplated by the Comprehensive Mediation Settlement Agreement and UPMIFA Order.

**F.    Plan Support Agreement**

Prior to the Petition Date, as contemplated by the Comprehensive Mediation Settlement, the parties to the Comprehensive Mediation Settlement Agreement all executed and delivered the Plan Support Agreement, pursuant to which they committed their support of the Plan as drafted by the Debtor.  A copy of the Plan Support Agreement is attached hereto as Exhibit C.

## ARTICLE V

## THE CHAPTER 11 CASE

**A.    The Petition, Schedules, and Statement of Financial Affairs**

On the Petition Date, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, its schedules of assets and liabilities, and statement of financial affairs.  Creditors are encouraged to review the schedules and statement of financial affairs for more information regarding the Debtor's assets, liabilities, and prepetition transactions.  The Debtor's schedules and statement of financial affairs are available at Docket No. [INSERT].

**B.    Retention Applications**

The Debtor has filed applications to retain various professionals (collectively, the "Employment Applications") in connection with the prosecution and administration of the Chapter 11 Case and related litigation.  Among the professionals the Debtor has sought to retain are:  (i) Bradley Arant Boult Cummings LLP, as bankruptcy co-counsel; (ii) Silver, Voit & Garrett, as bankruptcy co-counsel; and (iii) Christian & Small, as special litigation counsel for the Debtor.

**C.    Meeting of Creditors**

The Bankruptcy Administrator scheduled the initial meeting of creditors under section 341 of the Bankruptcy Code for [DATE AND TIME].

**D.    Bar Date Motion**

On [INSERT], the Debtor filed *Debtor's Motion for an Order (A) Establishing Bar Dates for Filing Prepetition Proofs of Claim (B) Approving the Form and Manner of Notice Thereof and (C) Granting Related Relief* [Docket No. INSERT] (the "Bar Date Motion").  Pursuant to the Bar Date Motion, the Debtor requested that the Bankruptcy Court set [INSERT] at 5:00 p.m. prevailing central time as the deadline for any person or entity holding a prepetition Claim against the Debtor to file a written proof of claim with the Bankruptcy Court.  The Bankruptcy Court [INSERT].

# ARTICLE VI

## SUMMARY OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THE SUMMARY OF THE PLAN CONTAINED HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

### A.    Classification and Treatment of Claims and Interests

#### 1.    General

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 bankruptcy plan. Because the Debtor is a not-for-profit corporation, there are no equity interests addressed by the Plan.

An "allowed" administrative expense or claim simply means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense or claim, including the amount thereof, is in fact a valid obligation of the Debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense or claim is automatically "allowed" unless the Debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim before the deadline to file proofs of claim.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against the Debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together. Because an entity may hold multiple claims which give rise to different legal rights, the holders of such claims may find themselves as members of multiple classes of claims.

Under a chapter 11 plan, the separate classes of claims must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the

holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced.

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, the following designates the Classes of Claims under the Plan. A Claim is in a particular Class for purposes of voting on, and of receiving Distributions pursuant to, the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Allowed Claim has not been paid, released or otherwise settled prior to the Effective Date. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class. All Claims, except Administrative Expenses, Priority Tax Claims and Professional Fee Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, Priority Tax Claims and Professional Fee Claims have not been classified, although the treatment of such Claims is set forth in the Plan and summarized below.

## 2. Unclassified Claims

### (a) General Administrative Expenses

Except to the extent that a holder of an Allowed General Administrative Expense Claim agrees to different treatment of such General Administrative Expense Claim, the holder of such Allowed General Administrative Expense Claim shall receive Cash in an amount equal to such Allowed General Administrative Expense Claim on (i) the Effective Date or (ii) if such Claim is not an Allowed General Administrative Expense Claim as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed General Administrative Expense Claim or as soon thereafter as is reasonably practicable. To the extent a General Administrative Expense

Claim has not been Allowed as of the Effective Date of the Plan, the Plan Trustee shall reserve sufficient amounts from the Plan Trust Assets for the resolution of such Claim.

(b)     General Administrative Bar Date

Except as provided below for Professionals requesting compensation or reimbursement for Claims for Professional Fees, requests for payment of General Administrative Expenses must be filed no later than thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of General Administrative Expenses who are required to file a request for payment of General Administrative Expense and who do not file such request by the General Administrative Expense Bar Date, shall be forever barred from asserting such General Administrative Expense against the Debtor or the Debtor's property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such General Administrative Expense.

(c)     Professional Fees

(i)     Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and all other parties that have requested notice in the Chapter 11 Case by no later than forty-five (45) days after the Effective Date. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the applicable Professional no later than seventy-five (75) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Plan Professional Fee Reserve; *provided, however,* that if the funds in the Plan Professional Fee Reserve are insufficient to pay the full Allowed amounts of the Professional Fees, the Plan Trustee shall promptly pay any remaining Allowed amounts from Cash on hand in the Plan Trust.

(ii)     Plan Professional Fee Reserve

Prior to the Effective Date, the Debtor shall establish a Plan Professional Fee Reserve in an amount equal to all asserted Claims for Professional Fees accrued and unpaid through the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Debtor), which may be maintained in an interest-bearing account. The Plan Professional Fee Reserve shall be administered by the Plan Trustee in accordance with the Plan Trust Agreement; *provided, however*, amounts held in the Plan Professional Fee Reserve shall not constitute property of the Plan Trust. In the event there is a remaining balance in the Plan Professional Fee Reserve following payment to all holders of

Allowed Claims for Professional Fees under the Plan, any such amounts shall be distributed to holders of Allowed Claims in accordance with the terms of the Plan.

Professionals shall estimate their unpaid Claims for Professional Fees incurred through the projected Effective Date and shall deliver such estimate to counsel for the Debtor no later than forty-eight (48) hours before the projected Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of filed Professional Fee Claims. To the extent that Allowed Professional Fee Claims exceed the amount of any estimate, the Plan Professional Fee Reserve shall be supplemented to account for such amount, with such supplemental funds being taken from proceeds of the Plan Trust Assets. If a Professional does not provide an estimate, the Debtor shall estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of funding the Plan Professional Fee Reserve on the Effective Date.

(iii)    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, as determined by the Debtor, either (a) on, or as soon thereafter as is reasonably practicable, the Effective Date or, if such Allowed Priority Tax Claim is not allowed as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Effective Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim plus interest at a rate determined in accordance with section 511 of the Bankruptcy Code.

To the extent not previously set, the Confirmation Order shall establish a deadline for filing proofs of claim or requests for payment of Priority Tax Claims which must be filed no later than thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. To the extent a Priority Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Trustee shall reserve from the Plan Trust Assets a sufficient amount for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Tax Claims under the Plan, any such amounts shall be distributed Allowed Claims in accordance with the terms of the Plan.

(iv)    Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Statutory Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. Statutory Fees relating to any period of time after the occurrence of the Effective Date shall be paid by the Plan Trustee. All Statutory Fees shall be payable as set forth above and such obligations shall continue until the earliest to occur of the Debtor's Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### 3. Classified Claims and Interests

(a) Class 1 – Priority Non-Tax Claims

Class 1 consists of all Allowed Priority Non-Tax Claims. Except to the extent previously satisfied during the Chapter 11 Case or that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each such holder, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Non-Tax Claim, shall receive Cash in the amount equal to 100% of the Allowed amount of such Priority Non-Tax Claim, on or as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes Allowed, and (z) the date such Claim becomes due and payable in the ordinary course of business. To the extent a Priority Non-Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Trustee shall reserve sufficient amounts from the Plan Trust Assets for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Non-Tax Claims under the Plan, any such amounts shall be distributed Pro Rata to holders of Allowed Claims in Classes 2, 3, and 5 as provided below.

Class 1 is Unimpaired under the Plan. Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(b) Class 2 – Bond Lease Claim

Class 2 consists of the Bond Lease Claim that remains unpaid and outstanding as of the Effective Date. The Bond Lease Claim shall be Allowed in the aggregate principal amount of $ 9,030,000.00, plus any prepetition interest, reasonable fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to the Bond Lease, the Bond Indenture, and any other Bond Documents. Neither the Indenture Trustee nor any of the Bondholders shall be required to file proofs of Claim on account of the Bond Lease Claim or the Bonds.

Commencing on the Effective Date, the Indenture Trustee, as holder of Bond Lease Claim, shall receive, for the benefit of the Bondholders, in full and final satisfaction, settlement, and release of, and in exchange for, the Bond Lease Claim and any and all Claims of any and all of the Bondholders, the following Distributions:

    i.    From the Restricted Funds, (A) the Indenture Trustee Agreed Fee, which shall be paid by the Debtor to the Indenture Trustee, plus (B) seventy-five percent (75.0%) of the Net Remaining Restricted Funds, which funds shall be paid by the Debtor to the Plan Trustee for the benefit of the holder of the Bond Lease Claim;

    ii.    Seventy-five percent (75.0%) of the Net External Trust Recoveries;

iii. One hundred percent (100.0%) of the Net Retained Accountant Claim Recoveries;

iv. From the Baptist Entities Plan Contribution paid by the Baptist Entities to the Debtor, the Debtor shall distribute Four Hundred Thousand Dollars ($400,000) to the Indenture Trustee, with the other Three Hundred Fifty Thousand Dollars ($350,000) to be distributed by the Debtor to the Bondholders Committee Counsel in full satisfaction of the Bondholders Committee Substantial Contribution Payment; and

v. All Allowed Class 2 Claims, Allowed Class 3 Claims, and Allowed Class 5 Claims shall receive their respective Pro Rata share of the Net Cash Proceeds derived from the Other Assets that remain after payment of all Allowed Administrative Expenses, Allowed Professional Fees, Allowed Priority Tax Claims, and Allowed Non-Priority Tax Claims.

vi. Notwithstanding anything to the contrary in the Plan, all fees and expenses to which the Indenture Trustee shall be entitled for compensation and reimbursement under the Bond Documents shall be payable solely out of the Distributions made under the Plan on account of the Bond Lease Claim and otherwise as provided in the Bond Documents.

Class 2 is Impaired under the Plan. With respect to the Bond transaction, the only Allowed Claim against the Debtor is the Bond Lease Claim held by the Indenture Trustee, as the Bonds were issued by the Authority and the Bondholders do not hold any direct Claim against the Debtor under, relating to, or on account of the Bonds. Recognizing that the Bondholders hold the beneficial interests in the Bond Lease Claim, the Plan Procedures Order provides that the Bondholders as of the Voting Record Date shall be entitled to vote to accept or reject the Plan on behalf of Class 2. As more fully set forth in the Plan Procedures Order, for voting purposes only, the aggregate amount of Allowed Class 2 Claims shall be deemed to be $9,030,000, the current outstanding principal amount of the Bonds, and each Bondholder as of the Voting Record Date shall be authorized and able to vote the outstanding principal amount of the Bonds that such Bondholder beneficially holds as of the Voting Record Date. The Indenture Trustee shall not have the right to cast a Ballot on behalf of the Bond Lease Claim.

(c) Class 3 – The Bank Claims

Class 3 consists of the Bank Claims that shall be Allowed as follows:

i. The FCB Claim shall be Allowed in the principal amount of $921,790.47, plus any prepetition interest, reasonable fees, costs, expenses, and other amounts accrued prior to the Petition Date

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document   Page 35 of 160

pursuant to the FCB loan documents. FCB shall not be required to file a proof of Claim on account of the FCB Claim.

    ii.    The Marion Bank Claim shall be Allowed in the principal amount of $2,534,484.41, plus any prepetition interest, reasonable fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to the Marion Bank loan documents. Marion Bank shall not be required to file a proof of Claim on account of the Marion Bank Claim.

    iii.    The West Alabama Bank Claim shall be Allowed in the principal amount of $1,610,207.19, plus any prepetition interest, reasonable fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to the West Alabama Bank loan documents. West Alabama Bank shall not be required to file a proof of Claim on account of the West Alabama Bank Claim.

Commencing on the Effective Date, each of the Banks shall receive on account of, and in full and final satisfaction, settlement, and release of, their Allowed Class 3 Claims, the following Distributions:

    i.    their respective Pro Rata share of twenty-five percent (25.0%) of the Net Remaining Restricted Funds;

    ii.    their respective Pro Rata share of twenty-five percent (25.0%) of the Net External Trust Recoveries; and

    iii.    All Allowed Class 2 Claims, Allowed Class 3 Claims, and Allowed Class 5 Claims shall receive their respective Pro Rata share of the Net Cash Proceeds derived from the Other Assets that remain after payment of all Allowed Administrative Expenses, Allowed Professional Fees, Allowed Priority Tax Claims, and Allowed Non-Priority Tax Claims.

Class 3 is Impaired under the Plan. Therefore, holders of Claims in Class 3 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan.

    (d)    Class 4 – Indemnity Claims

Class 4 consists of the Allowed Indemnity Claims. Pursuant to the Comprehensive Mediation Settlement Agreement, each holder of an Allowed Indemnity Claim has agreed to, and shall waive and release, all Indemnity Claims he, she, or it have or may have against the Debtor, as of the Effective Date, in consideration for the Releases under this Plan and under the Comprehensive Mediation Settlement Agreement.

Class 4 is Impaired under the Plan. Therefore, holders of Indemnity Claims in Class 4 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each Indemnity Claimant asserting an Indemnity Claim shall be deemed to hold an Allowed Indemnity Claim equal to $1.00.

(e)     Class 5 – General Unsecured Claims

Class 5 consists of all Allowed General Unsecured Claims. Class 5 consists of all Other Priority Claims ("Class 5 Claims"). All Allowed Class 2 Claims, Allowed Class 3 Claims, and Allowed Class 5 Claims shall receive their respective Pro Rata share of the Net Cash Proceeds derived from the Other Assets that remain after payment of all Allowed Administrative Expenses, Allowed Professional Fees, Allowed Priority Tax Claims, and Allowed Non-Priority Tax Claims.

To the extent there are any Allowed Class 5 Claims, Class 5 is Impaired under the Plan. Therefore, holders of Claims in Class 5 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan.

## B.     Acceptance or Rejection of the Plan

### 1.     Voting Classes

Classes 2, 3, 4, and 5 are Impaired under the Plan and, therefore, holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan. If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

### 2.     Presumed Acceptance of the Plan

Class 1 is Unimpaired under the Plan. Holders of Claims in such Class are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### 3.     Non-Consensual Confirmation

Classes 2, 3, 4, and 5 are Impaired under the Plan. Should any of those Classes vote to reject the Plan, the Debtor will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Class and any other class that is

entitled to vote and rejects the Plan. The Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 4. Elimination of Vacant Classes

Any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 5. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

## C. Means for Implementation of the Plan

### 1. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class in accordance with the Plan are intended to be, and shall be, final. In accordance with the terms of the Comprehensive Mediation Settlement Agreement, upon Confirmation of the Plan, (a) the Bondholders Committee Counsel shall be Allowed an Administrative Claim in the amount of the Bondholders Committee Substantial Contribution Payment, which Claim shall be payable solely from the proceeds of the Baptist Entities Plan Contribution in accordance with the terms of the Plan, and (b) the Indenture Trustee shall be Allowed an Administrative Claim in the amount of the Indenture Trustee Agreed Fee, which claim shall be payable solely from the Restricted Funds in accordance with the terms of the Plan.

### 2. Sources of Cash for Plan Distributions

The Debtor shall fund Distributions under the Plan with: (a) Cash on hand; (b) the Restricted Funds, as made available to fund the Plan pursuant to the UPMIFA Order; (c) the Baptist Entities Plan Contribution; and (d) all other proceeds, if any, generated from the liquidation of the Plan Trust Assets. Notwithstanding anything in the Plan to the contrary, the Plan Trustee shall fully fund (i) the Professional Fees Reserve and (ii) any other reserves

contemplated by the Plan or the Plan Trust Agreement prior to making any distributions of Plan Trust Assets under the terms of the Plan.

On the Effective Date, from the Restricted Funds, the Debtor shall (a) deliver Cash in the amount of the Plan Professional Fee Reserve to the Plan Trustee to be held in escrow per the terms of the Plan, (b) pay the Indenture Trustee Agreed Fee in Cash to the Indenture Trustee and (c) disburse the Net Remaining Restricted Funds in Cash in accordance with the terms of the Plan (i) to the Plan Trust for the benefit of the holder of the Allowed Class 2 Claim and (ii) directly to the holders of Allowed Class 3 Claims.

With respect to the Baptist Entities Plan Contribution, the Baptist Entities Plan Contribution shall be made on the Effective Date by the Baptist Entities not only in consideration of the Releases of the Released Causes of Action against the Baptist Entities pursuant to the Comprehensive Mediation Settlement Agreement, but also in consideration of the releases of the Released Causes of Action against the Debtor and the Debtor's Representatives (including the Indemnity Claimants) that are set forth in Article VIII of the Plan.

### 3. Continued Corporate Existence; Vesting of Revested Assets

On and after the Effective Date, subject to the requirements of the Plan, the Debtor will continue to exist as the Reorganized Debtor and shall retain all of its powers under applicable non-bankruptcy law, subject to the terms and conditions of its amended bylaws and charter, and without prejudice to any right to amend its constituent documents, dissolve, merge, or convert into another form of business entity, or to alter or terminate its existence. On the Effective Date, all of the Revested Assets shall vest in the Reorganized Debtor, as reorganized under the Plan, free and clear of all Liens, Claims, charges, interests, and encumbrances.

### 4. Establishment of Plan Trust

On the Effective Date, the Debtor shall establish a Plan Trust, which shall, among other things and as more fully set forth in the Plan Trust Agreement: (i) administer the resolution, asset administration, and distribution process for Allowed Claims, (ii) prosecute the Plan Trust Causes of Action, and (iii) liquidate any Plan Trust Assets.

Under section 1141(b) of the Bankruptcy Code, the Plan Trust Assets shall be assigned, transferred, and vest in the Plan Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests. The Plan Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701-4(d) and shall be treated as a grantor trust for United States federal income tax purposes.

The Plan Trust Agreement shall be in form and substance satisfactory to the Debtor, the Indenture Trustee, counsel for the Bondholders Committee, and the Banks. The operations of the Plan Trust shall be managed by the Plan Trustee, subject to the oversight and direction of the Plan Trust Oversight Committee. Subject to the approval of the Plan

Trust Oversight Committee, the Plan Trustee alone shall manage the day-to-day operations of the Plan Trust, including, without limitation, liquidating the assets of the Plan Trust, appearing as a party in interest, prosecuting the Plan Trust Causes of Action, prosecuting objections to, settling or otherwise resolving Claims (other than Claims Allowed under the Plan), calculating distributions, paying taxes and such other matters as more particularly described in the Plan Trust Agreement. Notwithstanding anything in the Plan to the contrary, the Plan Trustee shall be responsible for making distributions from the Plan Trust to Holders of Allowed Claims in accordance with the terms of the Plan. Expenses and fees of the Plan Trust, including the expenses of the Plan Trustee and its representatives and professionals, will constitute expenses payable from Plan Trust Assets in accordance with the Plan Trust Agreement. No Plan Trust Assets that are entitled to be distributed on account of Bank Claims or General Unsecured Claims shall be used to investigate or pursue Retained Accountant Claims.

As of the Effective Date, the Plan Trustee shall have those powers, duties, and responsibilities as set forth in the Plan Trust Agreement.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the Plan Trust Assets.

The Plan Trustee may be removed by the Bankruptcy Court upon application by any creditor or party-in-interest for good cause shown. In the event of the resignation, removal, death, or incapacity of the Plan Trustee, the Plan Trust Oversight Committee shall appoint another Person to become Plan Trustee and shall promptly thereafter file notice of the appointment of such successor Plan Trustee with the Bankruptcy Court. Any successor Plan Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor.

No recourse will ever be had, directly or indirectly, against the Plan Trustee, the Plan Trust, the Plan Trust Oversight Committee, their respective officers, directors, employees, members, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Plan Trust under the Plan or by reason of the creation of any indebtedness by the Plan Trust or the Plan Trustee under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Plan Trust Assets. The Plan Trustee shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under this Plan. The Plan Trust and the Plan Trustee, and their respective officers, directors, employees, members, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this will not apply to any gross negligence or willful misconduct by the Plan Trust, the Plan Trustee, or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

To the extent not set forth in the Plan, the composition, governance, powers, and duties of the Plan Trust Oversight Committee with respect to the Plan Trust shall be set forth in the Plan Trust Agreement.

### 5.        Corporate Action

On the Effective Date, all matters under the Plan involving or requiring action of the trustees, directors, or officers of the Debtor, including, but not limited to, actions requiring a vote or other approval of the board of trustees or any of the officers of the Debtor or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the trustees, directors, or officers of the Debtor.

### 6.        Closing the Chapter 11 Case

As soon as practicable after the Plan Trust exhausts substantially all of the Plan Trust Assets by making the final distributions under the Plan, the Plan Trustee shall, at the expense of the Plan Trust, (a) provide for the retention and storage of the Debtor's books and records that shall have been delivered to or created by the Plan Trustee until such time as all such books and records are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books and records are being stored, (b) file a motion for entry of a final decree closing the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules and stating that the assets of the Plan Trust have been exhausted and final distributions have been made under the Plan, (c) file any necessary paperwork in the appropriate jurisdictions to effectuate the dissolution of the Plan Trust in accordance with the laws of such jurisdiction, and (d) resign as the Plan Trustee.  Upon the Bankruptcy Court's entry of a Final Order granting the motion described in clause (b) of the preceding sentence, the Plan Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Plan Trust or payments to be made in connection therewith, and the Chapter 11 Case shall be closed on the date that the Bankruptcy Court has entered such Final Order.

Notwithstanding the immediately preceding paragraph, if the Plan Trustee deems it appropriate and has the approval of the Plan Trust Oversight Committee, the Plan Trustee may seek authority from the Bankruptcy Court to close the Chapter 11 Case and dissolve the Plan Trust prior to all final Distributions having been made under the Plan.

### 7.        Costs and Expenses of the Plan Trustee

All Plan Trustee fees and expenses shall be the responsibility of and paid by the Plan Trustee from the Plan Trust Assets, without further notice to holders of Claims or approval of the Bankruptcy Court.

### 8. Cancellation of Loans, Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (i) the Bond Documents, the Bonds, the Bank Loan Documents, and any other certificate, note, purchase right, option, warrant, bond, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of the Debtor giving rise to any Claim, shall be deemed cancelled and surrendered as to the Debtor without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Debtor shall not have any continuing obligations thereunder or in any way related thereto; and (ii) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the certificates, notes, purchase rights, options, warrants, bonds, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be deemed satisfied in full and released without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan; *provided further* that the Bank Loan Documents, the Bonds, and the Bond Documents shall continue in effect with respect to any obligations thereunder governing the relationships among the Banks (with respect to the Bank Loan Documents) and the relationships among the Indenture Trustee and the Bondholders (with respect to the Bond Documents).

### 9. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Trustee is authorized to, and may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan.

### 10. Section 1146 Exemption

To the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, sales and use taxes, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document      Page 42 of 160

## 11.     Retained Claims

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Plan Trust Causes of Action preserved pursuant to the Plan that the Debtor may hold against any Person shall be transferred to and vest the Plan Trust upon the occurrence of the Effective Date.  Except as otherwise provided in the Plan, the Plan Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Plan Trust Causes of Action. The Plan Trustee with the approval of the Plan Trust Oversight Committee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Plan Trust Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Revested Causes of Action preserved pursuant to the Plan that the Debtor may hold against any Person shall be transferred to and revest in the Reorganized Debtor upon the occurrence of the Effective Date.  Except as otherwise provided in the Plan, the Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Revested Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Revested Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in the Plan.

Unless any Estate Causes of Action are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in the Plan, or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor and the Plan Trustee shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Revested Causes of Action and Plan Trust Causes of Action, respectively, whether arising before or after the Petition Date, and the Reorganized Debtor's and the Plan Trustee's rights to commence, prosecute or settle such Revested Causes of Action and Plan Trust Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.  Other than the Released Causes of Action, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Confirmation Order to any Estate Cause of Action against them as any indication that the Reorganized Debtor or the Plan Trustee will not pursue any and all available Estate Causes of Action against them. The Reorganized Debtor and the Plan Trustee expressly reserve all rights to prosecute any and all Revested Causes of Action and Plan Trust Causes of Action, respectively, against any entity, except as otherwise expressly provided herein.  Unless any Estate Causes of Action against an entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in the Plan or the Confirmation Order, the Debtor and the Plan Trustee expressly reserve all Estate Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

Case 24-20004     Doc 4     Filed 01/08/24     Entered 01/08/24 17:54:41     Desc Main
Document      Page 43 of 160

equitable, or otherwise), or laches, shall apply to such Estate Causes of Action upon, after, or as a consequence of the confirmation of the Plan. For the avoidance of doubt, nothing in the Plan shall require the Plan Trustee to commence or pursue litigation concerning any Plan Trust Cause of Action.

### D. Treatment of Executory Contracts and Unexpired Leases

#### 1. Executory Contracts and Unexpired Leases

On the Confirmation Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtor entered into prior to the Petition Date (subject to the provisions of Article VI of the Plan), other than those executory contracts and unexpired leases identified in the Plan Supplement for assumption by the Reorganized Debtor or the Plan Trustee, shall be deemed rejected by the Debtor pursuant to the provisions of section 365 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Confirmation Date.

#### 2. Rejection Damages Bar Date

All Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Plan Trustee on or before the date that is thirty (30) days after the later of (a) the Effective Date and (b) the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, its Estate, the Plan Trustee, and the Plan Trust Assets. A Claim for rejection damages shall be classified and treated in Class 5 (General Unsecured Claims). Pursuant to the Comprehensive Mediation Settlement Agreement, neither the Indenture Trustee nor the Authority shall have a Claim for the rejection of the Bond Lease or the Ground Lease.

#### 3. Effect of Post-Confirmation Rejection

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtor entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

#### 4. Non-Occurrence of Effective Date

If the Effective Date does not occur prior to such time as the Chapter 11 Case is closed, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 5. Indemnification Obligations

Any obligations of the Debtor pursuant to its certificate of incorporation and bylaws, or pursuant to its organizational documents or applicable non-bankruptcy law, or any other agreements entered into by the Debtor at any time prior to the Effective Date, to indemnify current and/or former trustees, directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings brought by any of the College Accountants or their Representatives against the Debtor or such trustees, directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtor, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date shall not be released, waived, discharged or Impaired by confirmation of the Plan. Such obligations shall be deemed and treated as an executory contract assumed as of the Effective Date by the Debtor under the Plan and shall continue as obligations of the Plan Trust.

### 6. Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtor that any executory contract or unexpired lease is, in fact, an executory contract or unexpired lease or that the Debtor has any liability thereunder.

### E. Provisions Governing Distributions

### 1. Plan Distributions

The Plan Trustee shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 2. Distribution Record Date

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtor, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. The Debtor shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. The Debtor and the Plan Trustee, as applicable, shall be entitled to recognize and deal for all purposes under the Plan only with those holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.**

### 3. Objections to Claims; Estimation of Claims

Except insofar as a Claim is Allowed under the Plan, the Plan Trustee, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court upon the request of the Plan Trustee (the "Claims Objection Deadline"). Nothing in the Plan shall require the Debtor or the Plan Trustee to object to any Claim.

The Plan Trustee may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtor may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

The Debtor and the Plan Trustee shall be entitled to assert and reserve any and all defenses to the allowance of Claims other than the Bond Lease Claim, the Bank Claims, and the Indemnity Claims, each of which shall be Allowed as set forth in the Plan.

### 4. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no Distribution of Cash or property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan. The procedures with respect to the resolution of Disputed Claims shall be set forth in the Plan Supplement. For the avoidance of doubt, to the extent a Class of Claims will be entitled to no Distributions under the Plan, such Claims will not be subject to reconciliation by the Plan Trustee.

### 5. Reserve of Cash Distributions

On any date that Distributions are to be made under the terms of the Plan, the Plan Trustee shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document      Page 46 of 160

were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

### 6. Distribution After Allowance

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Plan Trustee shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends, or proceeds thereof, to which a holder of an Allowed Claim is then entitled in accordance with the Plan and the Plan Trust Agreement; *provided* that, to the extent any Plan Trust Assets have not yet been collected or liquidated by the Plan Trustee, such Plan Trust Assets shall be distributed to holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof.

### 7. No Recourse

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtor, the Estate, the Plan Trustee, or any of their respective professionals, consultants, officers, trustees, directors, or members or their successors or assigns, or any of their respective property. Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

### 8. Application of Distributions

Any Distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

### 9. Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Plan Trustee has determined the then-current address of such holder, at which time such Distribution shall be made to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such Distribution was attempted to be made; *provided further* that Plan Trustee shall use reasonable efforts to locate a holder if any Distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Plan Trustee automatically and without need for a further order by the Bankruptcy

Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be forever barred.

### 10. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Plan Trustee shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Plan Trustee reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances, *provided that* the Debtor and the Plan Trustee, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan, *provided that* if the recipient provides the required information or otherwise satisfies the Plan Trustee that withholding is not required within 180 days after the request is made, such withheld amount shall then be distributed to the recipient.

In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.

### 11. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, Confirmation Order or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 12. Foreign Currency Exchange Rate

Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the then applicable noon spot rate for such non-U.S. currency as of the Petition Date for all purposes under the Plan, including voting, allowance, and distribution.

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document   Page 48 of 160

### 13. Setoffs and Recoupment

The Debtor and/or the Plan Trustee are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Plan Trustee of any such claim they may have against the holder of such Claim.

### 14. Distributions Free and Clear

Except as may be otherwise provided in the Plan, all Distributions under the Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

### 15. De-Minimis Distributions and Donation

There shall be no Distributions on account of Allowed General Unsecured Claims to the extent such Distribution will result in a payment of less than $50.00 to the holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the Plan Trust. Unless otherwise set forth in the Plan or the Plan Trust Agreement, the Plan Trustee may donate any remaining Plan Trust Assets to a charitable institution if the Distribution of such assets is too costly, too burdensome, or impracticable.

### 16. Claims Paid or Payable by Third Parties

(a) Claims Paid by Third Parties

The Debtor or the Plan Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party other than the Debtor. To the extent a holder of a Claim receives a Distribution on account of such Claim under the Plan and receives payment from a party other than the Debtor or the Plan Trustee on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the Distribution to the Debtor or Plan Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Plan Trustee annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

(b) Claims Payable by Third Parties

To the extent that one or more of the Debtor's insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action,

order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtor or the Plan Trustee, as applicable, and the holder of such Claim.

(c)     Applicability of Insurance Policies

Except as otherwise expressly set forth in the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or the Plan Trustee and any holders of Claims, may hold against any other Entity under any insurance policies.

**F.     Effects of Plan Confirmation**

**1.     Injunction**

Article VIII.A of the Plan provides an injunction as follows:

**Except as otherwise expressly provided in this Plan, and except in connection with the enforcement of the terms of this Plan or any documents provided for or contemplated in this Plan, all Entities who directly or indirectly have held, hold or may hold Claims against the Debtor or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the Estate, the Plan Trust, the Plan Trustee, or their successors and assignees or any of their assets and property, with respect to any such Claim; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Estate, the Plan Trust, the Plan Trustee, or their successors and assignees, or any of their assets and property, with respect to any such Claim; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the Estate, the Plan Trust, the Plan Trustee, or their successors and assignees or any of their assets and property, with respect to any such Claim; (d) asserting, directly or indirectly, any setoff, or recoupment of any kind against any obligation due the Debtor, the Estate, the Plan Trust, the Plan Trustee, or their successors and assignees or any of their assets and, with respect to any such Claim, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim. Without limiting the foregoing, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in effect until the Chapter 11 Case is closed. Nothing contained in this Article VIII.A shall**

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document      Page 50 of 160

prohibit the holder of a timely-filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or to enjoin or prohibit the interpretation or enforcement by the holder of such Claim of any of the obligations of the Debtor or the Plan Trustee under this Plan.

## 2.    Exculpation and Limitation of Liability

Article VIII.B of the Plan provides an exculpation provision as follows:

On the Effective Date, the Debtor, the Debtor's Board of Trustees, the Bondholders Committee, the Indenture Trustee, the Banks, the Indemnity Claimants, and the Baptist Entities, in all such parties' capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors and trustees, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns (collectively, the "<u>Exculpated Parties</u>"), shall not have or incur, and are hereby released from, any claim, obligation, Causes of Action, or liability to one another or to any holder of a Claim, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act taken or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of (i) the Chapter 11 Case, (ii) formulation, negotiation, and filing of this Plan, (iii) filing the Chapter 11 Case, (iv) the pursuit of confirmation of this Plan, (v) the consummation and implementation of this Plan, (vi) or the administration of this Plan or the property to be distributed under this Plan, or (vii) any other post-petition act taken or omission originating or occurring in connection with or in contemplation of the restructuring or liquidation of the Debtor, except for any fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Case and (ii) the Debtor's indemnification obligations or other contractual obligations to officers, trustees, and directors. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking

**to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Article <u>VIII.B</u>.**

3. **Release by the Debtor**

Article VIII.C of the Plan provides for the Debtor's release of certain claims as follows:

**On the Effective Date, the Debtor, on its own behalf and the Estate, shall be deemed to release unconditionally (a) all of their Representatives and (b) the Released Parties, of and from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their capacities described above for any omission, transaction, agreement or event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor or its business and affairs, the Bonds, the Bond Claims, the Bond Lease Claim, the Bond Documents, the Bank Claims, the Bank Loan Documents, the Chapter 11 Case, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Mediation, any transactions proposed in connection with the Chapter 11 Case or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed hereunder; <u>provided</u>, <u>however</u>, that the foregoing provisions of this section shall not affect (i) any liability of any of (a) the College Accountants; (b) the External Trusts other than those for which the Baptist Foundation is or has served as trustee; (c) the trustees of the External Trusts other than the Baptist Foundation; and (d) any issuers of any past or current insurance policies that provide or may have provided coverage of any kind for the benefit of the Debtor and/or any of the Indemnity Claimants; (ii) the liability of any Person for any act or omission that constitutes gross negligence, willful misconduct, fraud or criminal acts as determined by a Final Order, (iii) any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents to be, or that were previously, entered into in connection with the Plan, (iv) except as otherwise expressly set forth in the Plan, any objections by the Debtor or the Plan Trustee to Claims filed by any Person against the Debtor and/or the Estate, including rights of setoff, refund, recoupment or other adjustments, or (iv) the rights of the Debtor or the Plan Trustee to assert any applicable defenses, cross-claims, counterclaims, or other Causes of Action in litigation or other proceedings asserted against the Debtor. The releases in this Article VIII.C apply only to the Released Parties solely in their respective**

capacities as such. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees.

4.      Release by Holders of Claims and Other Parties in Interest

Article VIII.D of the Plan provides for a release by Holders of Claims and other parties in interest as follows:

> **On the Effective Date, the Released Parties, and all other Persons and their Representatives who directly or indirectly have held, hold, or may hold Claims or Causes of Action against the Debtor or the Estate, whether known or unknown, shall be deemed by virtue of their receipt of Distributions or the other treatment contemplated under the Plan, and with respect to those Released Parties that are Mediation Parties, by virtue of their execution and delivery of the Comprehensive Mediation Settlement Agreement, to have forever waived and released all such rights, Claims, or Causes of Action, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against any of the Debtor Released Parties or any of the other Released Parties and shall be deemed to have covenanted with each of the Debtor Released Parties and each of the Released Parties to release and not to (a) sue or otherwise seek recovery from any of the Debtor Released Parties or any of the other Released Parties on account of any Claim, Cause of Action, obligation, suit, judgment, damages, right and liability whatsoever, in any way in any way related to the Debtor or related to or arising out (whether directly or indirectly) of the Debtor's business affairs, the Bonds, the Bond Claims, the Bond Lease Claim, the Bond Documents, the Bank Claims, the Bank Loan Documents, the Chapter 11 Case, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Mediation, the transactions proposed in connection with the Chapter 11 Case or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed hereunder, including but not limited to any Claim or Causes of Action based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act, occurrence, or failure to act from the beginning of time through the Effective Date or (b) assert against any of the Debtor Released Parties or any other Released Party any Claim, Cause of Action, obligation, suit, judgment, damages, right, or liability that any holder of a Claim or Cause of Action may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtor, or its business and affairs, the Bonds, the Bond Claims, the Bond**

Lease Claim, the Bond Documents, the Bank Claims, the Bank Loan Documents, the Chapter 11 Case, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the transactions proposed in connection with the Chapter 11 Case or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed hereunder, **provided**, **however**, (i) none of the Debtor Released Parties or the Released Parties shall be released from any Claim or Cause of Action that is (A) wholly unrelated to the Bonds, the Bond Claims, the Bond Lease Claim, the Bond Documents, the Bank Claims, the Bank Loan Documents Bonds, the Bond Claims, or any other debts of the Debtor or the matters that are the subject of the Comprehensive Mediation Settlement Agreement and (B) primarily based on any act or omission that constitutes gross negligence, willful misconduct, fraud or criminal acts as determined by a Final Order, (ii) the foregoing release shall not apply to obligations arising under the Plan; and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees.

**5.      Terms of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under section 105 or section 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Case. For the avoidance of doubt, the releases, exculpations, and injunctions in Articles VIII.A, VIII.B, VIII.C and VIII.D of the Plan shall continue in full force and effect after the closing of the Chapter 11 Case.

**G.      Conditions to Confirmation and Effective Date**

**1.      Conditions to the Effective Date**

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B of the Plan:

i.      the Confirmation Order shall have become a Final Order in full force and effect and shall not subject to any stay of effectiveness;

ii.     the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

Case 24-20004    Doc 4    Filed 01/08/24    Entered 01/08/24 17:54:41    Desc Main
Document    Page 54 of 160

iii. all Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtor or placed in a reserve for such purpose;

iv. (a) the Baptist Entities shall have paid the Baptist Entities Plan Contribution to the Debtor, and (b) from the proceeds of the Baptist Entities Plan Contribution, the Debtor shall have distributed: (1) Three Hundred Fifty Thousand Dollars ($350,000) to the Bondholders Committee Counsel in full payment of the Bondholders Committee Substantial Contribution Payment and (2) the remaining Four Hundred Thousand Dollars ($400,000) to the holder of the Allowed Class 2 Claim;

v. (a) the Foundation UPMIFA Transfer shall have been made by the Debtor to the Foundation from the Restricted Funds, less (to the extent not previously reimbursed by the Foundation) amounts expended by the Debtor since the conveyance of the Campus Property to the Foundation for the maintenance, security, and insurance of, and utilities furnished to, the Campus Property, plus interest thereon at a fixed rate of five percent (5.0%) per annum, (b) the Plan Professional Fee Reserve shall been funded from the Restricted Funds, and (c) the balance of the Restricted Funds remaining thereafter shall have been disbursed by the Debtor to the Plan Trustee;

vi. the Plan Trust shall have been created, the Plan Trust Agreement shall have been fully executed, the Plan Trustee shall have been appointed, and the Plan Trust Assets shall have been transferred to the Plan Trust

vii. each of the Mann Lawsuit, the Banks Lawsuit, and the Indenture Trustee Lawsuit shall have been dismissed with prejudice, but such dismissals shall not be required unless and until items (i) through (vi) above have been satisfied;

viii. except as otherwise expressly provided in the Plan, all documents to be executed, delivered, assumed, or performed upon or in connection with consummation of the Plan shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than consummation of the Plan or notice of consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement;

Case 24-20004   Doc 4   Filed 01/08/24   Entered 01/08/24 17:54:41   Desc Main
Document      Page 55 of 160

ix. all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

x. there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan; and

xi. the Plan Professional Fee Reserve shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan.

## 2. Waiver of Conditions

The conditions to confirmation of the Plan and the Effective Date may be waived only by the written agreement of the Debtor, the Indenture Trustee, counsel for the Bondholders Committee, and the Banks, in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court.

## 3. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## H. Modification, Revocation or Withdrawal of Plan

## 1. Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtor reserves the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to revoke, withdraw, alter, amend, or modify the Plan, one or more times, after the Confirmation Date, to the extent necessary to carry out the purposes and intent of the Plan. The Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

## 2. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## 3. Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation Date or Effective Date

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file a subsequent plan. If the Debtor revokes or withdraws the Plan, the Confirmation Date does not occur, or the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## I. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the fullest extent permissible, including jurisdiction to:

i. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the secured or unsecured status, priority, amount, or allowance of Claims;

ii. decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

iii. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor

55

may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

iv. ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

v. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

vi. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

vii. enter and enforce any order and related agreements for the sale or transfer of property and obligations thereunder pursuant to, among other things, sections 363, 1123, or 1146(a) of the Bankruptcy Code;

viii. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

ix. issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan and ensure compliance with the Plan;

x. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

xi. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the

recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VII.P.1 of the Plan;

xii.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

xiii.    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

xiv.    enter an order or final decree concluding or closing the Chapter 11 Case;

xv.    adjudicate any and all disputes arising from or relating to Distributions under the Plan;

xvi.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xvii.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

xviii.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

xix.    hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xx.    hear and determine all disputes that arise out of the transfer of the Plan Trust Assets to the Plan Trust on the Effective Date;

xxi.    enforce all orders previously entered by the Bankruptcy Court; and

xxii.    hear any other matter as to which the Bankruptcy Court has jurisdiction;

*provided, however*, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional,

forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

### J. Miscellaneous Provisions

#### 1. Immediate Binding Effect

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, and any and all holders of Claims (irrespective of whether such Claims are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtor's counterparties to executory contracts, unexpired leases, and any other prepetition agreements.

#### 2. Additional Documents

On or before the Effective Date, the Debtor may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor and all holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3. Filing of Monthly and Quarterly Reports and Payment of Statutory Fees

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Trustee. All monthly operating reports covering pre-Effective Date periods shall be prepared and filed by the Debtor. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Statutory Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. Statutory Fees relating to any period of time after the occurrence of the Effective Date shall be paid by the Plan Trustee. All Statutory Fees shall be payable as set forth above and such obligations shall continue until the earliest to occur of the Debtor's Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

#### 4. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or

shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims before the Effective Date.

### 5. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 6. Notices

All notices, requests, and demands to or upon the Debtor shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor, to:

> Judson College
> Attn: President
> 302 Bibb Street
> Marion, AL 3672

with copies to:

> Jay Bender
> James Bailey
> Bradley Arant Boult Cummings LLP
> 1819 5th Avenue North
> Birmingham, AL 35203
> Emails: jbender@bradley.com; jbailey@bradley.com

> and

> Alexandra Garrett
> Silver Voit Garrett & Watkins, P.C.
> 4317-A Midmost Drive
> Mobile, AL 36609

If to the Plan Trustee to:

> To be set forth in the Plan Supplement.

In the notice of the Effective Date, the Debtor shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the Bankruptcy Administrator) must file a renewed request to

receive documents pursuant to Bankruptcy Rule 2002. After service of the notice of the Effective Date, the Plan Trustee shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Bankruptcy Administrator and those Entities who have filed such renewed requests.

### 7. Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, (i) all injunctions or stays provided for in the Chapter 11 Case under section 105 or section 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Case and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

### 8. Entire Agreement

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 9. Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at https://www.alsb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

### 10. Nonseverability of Plan Provisions

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent of the Debtor; and (iii) nonseverable and mutually dependent.

**11.    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and therefore, neither the Debtor nor the Plan Trustee will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**12.    Votes Solicited in Good Faith**

The Plan Trustee shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any applicable Local Rules, and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**13.    Document Retention**

On and after the Effective Date, the Plan Trustee shall maintain documents in accordance with the terms and conditions of the Plan Trust Agreement.

**14.    Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, Plan Supplement, or any other document (but excluding, for the avoidance of doubt, the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan (without reference to the Plan Supplement), the Plan (without reference to the Plan Supplement) shall govern and control.

## ARTICLE VII

## CONFIRMATION OF THE PLAN

**A.    Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [DATE] at [____  __].m. prevailing Central Time before the Honorable [INSERT], United States Bankruptcy Court, [INSERT LOCATION] (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [DATE], at 5:00 p.m., prevailing Central Time**, by the following parties:

**Counsel to the Debtor:**

Bradley Arant Boult Cummings LLP          SILVER VOIT GARRETT & WATKINS,
1819 5th Avenue North                          ATTORNEYS AT LAW, P.C.
Birmingham, Alabama 35203                 Alexandra Garrett
Attn:   Jay R. Bender                              4317-A Midmost Drive
          James B. Bailey                           Mobile, AL 36609


**The Bankruptcy Administrator:**

Office of the United States Bankruptcy Administrator
Attn: Mark Zimlich
113 St. Joseph Street Suite 520
Mobile, AL 36602


Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.      Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all Classes of Claims or, if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of holders of Claims impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

#### 1.      Acceptance

Claims in Classes 2, 3, 4, and 5 are impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, impaired Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of

creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Class 1 is unimpaired under the Plan, and the holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan.

## 2.    Fair and Equitable Test

The Debtor will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtor believes that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims and unsecured claims, as follows:

(a)    Secured Creditors. Either (i) each holder of an impaired secured claim retains its liens securing their secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)    Unsecured Creditors. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

THE DEBTOR BELIEVES THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTOR WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

## 3.    Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or any successors

to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

By its terms, the Plan is a liquidation plan that provides for the winding-up of the Debtor's affairs and the distribution of its assets. Accordingly, the Plan specifically provides for the liquidation of the Debtor's assets in accordance with section 1129(a)(11) and the Bankruptcy Court's confirmation of the Plan will not be followed by an unanticipated liquidation or the need for any further reorganization.

## 4. Best Interests Test

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. The liquidation analysis attached hereto as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>") demonstrates that the Plan satisfies the requirements of the "best interests" test by showing that holders of Claims in all Impaired Classes will receive at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.[3]

The foundation of the Debtor's Plan is its implementation of the Comprehensive Mediation Settlement Agreement, through which the Debtor's creditors will receive not only the net proceeds derived from the liquidation of the Debtor's Estate property, but also millions of dollars from non-Estate sources that would not otherwise be available for payment of creditors' claims, absent confirmation of the Plan. As such, the Debtor anticipates that the confirmation of the Plan will provide both for a faster and more efficient liquidation of the Debtor's Estate assets and for enhanced recoveries due to the availability under the Plan of non-Estate assets such as the Restricted Funds and the Baptist Entities Plan Contribution, the net effect of which will result in greater distributions to creditors under the Plan than they would receive through a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

The distributions contemplated under the Plan could not occur in a Chapter 7 liquidation as the Mediation Parties have only agreed to provide certain consideration to the Debtor and accept payments on their Claims on the terms set forth in the Comprehensive Mediation Settlement Agreement and Plan. Under Chapter 7 of the Bankruptcy Code, none of the Mediation Parties are required to make contributions towards ultimate distributions to creditors or to accept payments on their Claims that are less than they are entitled to under applicable law. For instance, in a Chapter 7 liquidation, the Baptist Entities would not be required to provide the Baptist Entities Plan Contribution that provides additional cash consideration available for distribution under the terms of the Plan. Similarly, in a Chapter 7 liquidation, the Restricted Funds – which are not property of the Debtor's Estate as the

---

[3] The Debtor reserves the right to update and modify the Liquidation Analysis through the date of the Confirmation Hearing.

Case 24-20004    Doc 4    Filed 01/08/24    Entered 01/08/24 17:54:41    Desc Main
Document      Page 66 of 160

Debtor holds such funds in a trust capacity and only has authority under the UPMIFA Order to use such funds to pay creditor claims only if this Plan is confirmed – would not be available to pay creditor claims. The UPMIFA Order only authorizes the Debtor to use the Restricted Funds for the purposes set forth in the Comprehensive Mediation Settlement Agreement pursuant to a confirmed Chapter 11 plan. If the Plan is not confirmed, the Debtor may lose this right to use the Restricted Funds to pay its creditors, and a state court exercising its jurisdiction under UPMIFA may determine that the Restricted Funds, which are not property of the Debtor's bankruptcy Estate, must be transferred to another non-profit organization. For these reasons, the Debtor believes that the distributions proposed under the Plan will lead to a greater distribution to holders of Impaired Claims under the Plan than they would receive pursuant to a liquidation under Chapter 7.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 case, including: the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; and the potential increases in claims that would be satisfied on a priority basis or on a parity with creditors in the Chapter 11 Cases, the Debtor determined that confirmation of the Plan will provide each creditor with a recovery that is not less than it would receive pursuant to a liquidation under Chapter 7 of the Bankruptcy Code. Moreover, the Debtor believes that the value of any distributions to each Class of Allowed Claims in a Chapter 7 proceeding would be further impaired as compared to the value of distributions under the Plan because such distributions in Chapter 7 may not occur for a substantial period of time. Therefore, the Debtor believes that the Plan satisfies the requirements of the "best interests" test.

## ARTICLE VIII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

### A. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the

Case 24-20004    Doc 4    Filed 01/08/24    Entered 01/08/24 17:54:41    Desc Main
Document      Page 67 of 160

Debtor created Classes of Claims, each encompassing Claims, as applicable, that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B. Consummation of the Plan is subject to creditor acceptance and approval by the Bankruptcy Court

The Debtor has managed its assets under the supervision of the Bankruptcy Court since the Petition Date. Before it can be consummated, the Plan must be accepted by at least two-thirds in dollar amount and a majority in number of the Claims of Classes (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) entitled to vote to accept or reject the Plan. There can be no assurance that the Plan will be approved by the required majority of impaired creditors, and that even if approved, the Bankruptcy Court will confirm the Plan. The failure of any of these conditions will delay the consummation of the Plan.

The Plan provides that the Debtor reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable. In the event that any Class of Claims fails to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or modify the Plan in accordance with Article X thereof. While the Debtor believes that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not prevent confirmation of the Plan.

### C. Occurrence of the Effective Date of the Plan is subject to a number of significant conditions

The occurrence of the Effective Date is subject to certain conditions precedent as described in the Plan, including, among others, the requirement that the Debtor obtain the Baptist Entities Plan Contribution from the Baptist Entities. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

If the Plan is not consummated, any settlement, compromise or release embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims) and any document or agreement executed pursuant to the Plan, shall be null and void.

**D.** **The actual amount of Allowed Claims may differ from the estimated Claims and adversely affect the percentage recovery of Claims**

The estimated Claims set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Such differences may materially and adversely affect, among other things the percentage recoveries to holders of Allowed Claims under the Plan and the Debtor's ability to consummate the Plan.

**E.** **Delay in Liquidating Estate Causes of Action**

Distributions to holders of Allowed Claims under the Plan are partly dependent on the Plan Trustee's ability to litigate to judgment and/or settle the Plan Trust Causes of Action. The Debtor cannot predict the ultimate outcome regarding the liquidation and/or settlement of the Plan Trust Causes of Action. Even if the Plan Trust Causes of Action are ultimately liquidated and/or settled, the Debtor cannot predict the time necessary to accomplish that result. Any delay in liquidating and/or the Plan Trustee's inability to liquidate the Plan Trust Causes of Action may negatively impact distributions to holders of Allowed Claims under the Plan.

**F.** **No Duty to Update Disclosures**

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so under an order of the Bankruptcy Court. Delivery of this Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## ARTICLE IX.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax considerations relevant to the implementation of the Plan to holders of Claims entitled to vote on the Plan. This discussion is based on the current provisions of Title 26 of the United States Code (the "Tax Code"), applicable Treasury Regulations, judicial authority, and current administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"). There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below. This discussion does not address the federal income tax consequences to holders of Claims who are Unimpaired, or holders who are not entitled to vote because they are deemed to accept or reject the Plan or holders subject to special treatment under U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions,

insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar, holders that hold Claims as a position in a "straddle" or as part of a "synthetic currency," "hedging," "conversion," or other integrated transaction, or holders that have acquired Claims in connection with the performance of services. In addition, this discussion does not address U.S. federal taxes other than income taxes.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the holders of Claims or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan. The Debtor urges you to consult your own tax advisor regarding your particular circumstances and the U.S. federal tax consequences to you with respect to the Plan, as well as any tax consequences arising under the laws of any state, local, or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws. The following summary assumes that the Claims are held by holders as "capital assets" within the meaning of section 1221 of the Tax Code and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the distributions provided for under the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the holder in exchange for the Claim and whether the holder receives distributions hereunder in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, each holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOLLOWING DISCUSSION IS FOR GENERAL INFORMATION ONLY, DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION

THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION, AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY HOLDER.  NO OPINION OR REPRESENTATION WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO ANY SUCH HOLDER IS MADE.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT THE HOLDER'S OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES TO IT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICATION OF U.S. FEDERAL, STATE AND LOCAL TAX LAWS, AS WELL AS ANY APPLICABLE FOREIGN TAX LAWS, TO A CLAIM HOLDER'S PARTICULAR SITUATION, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

*     *     *     *

### A.     Certain U.S. Federal Income Tax Consequences to the Debtor

The Debtor is a not-for-profit corporation recognized by the Internal Revenue Service as exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code. As such, the Debtor generally does not have state or federal income tax liabilities.  However, if for any reason the Debtor becomes subject to taxation, the Plan may have certain tax consequences to the Debtor.

### B.     Federal Tax Consequences to Holders of Allowed Claims

All holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local, and foreign tax consequences of the Plan.  **THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO THE HOLDER OF ANY CLAIM OR INTEREST.**

### C.     Reservation of Rights

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtor and its advisors reserve the right to further modify, revise or supplement the tax related sections of the Plan up to the Confirmation Hearing Date.

**ARTICLE X**

**ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed, the Debtor or any other party in interest (if, under section 1121 of the Bankruptcy Code, the Debtor has not filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan.  Such a plan likely would result in additional costs, including, among other things,

69

additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expenses (subject to allowance). The Debtor believes that the Plan, which is the result of extensive negotiations with the other Mediation Parties and other parties in interest provides for an orderly and efficient liquidation of the Debtor's remaining assets and enables creditors to realize the best return under the circumstances.

If a plan under Chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Case may be converted to liquidation cases under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, under applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the Estate assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims, the Debtor believes that in a Chapter 7 liquidation, before creditors received any distributions, additional Administrative Expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation by the trustee. Moreover, if the case were converted to a chapter 7 bankruptcy, creditors would not be able to realize any recoveries from millions of dollars they stand to receive under the Plan from the Restricted Funds or the Baptist Entities Plan Contribution, neither of which constitute property of the Debtor's Estate.

Alternatively, if the Plan is not confirmed, the Debtor's bankruptcy case may be dismissed. Indeed, the Comprehensive Mediation Support Agreement expressly provides that if, for any reason, the Plan is not confirmed on or before March 31, 2024, then the parties agrees that they shall support and not oppose any motion filed by the College to dismiss its Chapter 11 Case. Upon dismissal of the Chapter 11 Case, creditors would be forced to resort to their available state law rights and remedies to try to collect upon their claims. Creditor would not be able to recover from the Restricted Funds, as those endowment funds are in the nature of trust funds due to the restrictions placed on them by their donors. Although the Debtor is committed to using the Restricted Funds to pay creditor claims pursuant to the Plan as it has been conditionally authorized to do by the UPMIFA Order, the Debtor is under no obligation to use those Restricted Funds to pay creditors if the settlement agreement is not consummated and, in such an event, would most certainly seek alternative relief under UPMIFA to transfer the Restricted Funds to one or more charitable institutions with missions consistent with that of the Debtor. In short, dismissal of the Chapter 11 Case would diminish the recoveries that creditors would realize on their claims if the Debtor obtains confirmation of its Plan and can then consummate the Comprehensive Mediation Settlement Agreement.

THE DEBTOR BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS THAN WOULD LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

Case 24-20004    Doc 4    Filed 01/08/24    Entered 01/08/24 17:54:41    Desc Main
Document      Page 72 of 160

# ARTICLE XI.

## CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation of the Plan is preferable to the alternatives described above because it will maximize recoveries for the Debtor's estate. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

*[Remainder of Page Intentionally Left Blank]*

Accordingly, the Debtor urges all holders of Claims entitled to vote on the Plan to vote to accept the Plan.

Dated:  January 8, 2024

Respectfully submitted,


By: _____ */s/ Daphne R. Robinson* _____
Name:      Daphne R. Robinson
Title:       President

**EXHIBIT A**

**Chapter 11 Plan of Judson College, Inc.**

# EXHIBIT B

**Comprehensive Mediation Settlement Agreement**

THE UNDERSIGNED PARTIES AND THEIR COUNSEL, HAVING MET WITH MEDIATOR C. EDWARD DOBBS, FOR MEDIATION OF THE DISPUTES AND PROCEEDINGS DESCRIBED AND REFERENCED BELOW ON JANUARY 17, 18, AND 30, 2023, HAVE AGREED TO RESOLVE AND SETTLE ALL SUCH DISPUTES AND PROCEEDINGS ON THE TERMS SET FORTH HEREIN. THIS MEDIATION SETTLEMENT AGREEMENT (THE "SETTLEMENT AGREEMENT") IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION. IT DOES NOT CONTAIN ALL OF THE TERMS OF A PROPOSED PLAN OF REORGANIZATION. THIS SETTLEMENT AGREEMENT IS A SETTLEMENT, AND THE ENTRY INTO THIS SETTLEMENT AGREEMENT SHALL NOT BE DEEMED AN ADMISSION OF ANY FACT, ISSUE, OR LIABILITY WITH RESPECT TO ANY OF THE DISPUTES OR PROCEEDINGS REFERENCED HEREIN.

March 24, 2023

This Settlement Agreement sets forth the principal terms of a proposed pre-negotiated chapter 11 plan (such plan, together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Plan Support Agreement (as defined below), the "Plan") of Judson College, which is to be filed in the chapter 11 case commenced in the United States Bankruptcy Court for the Southern District of Alabama (the "Bankruptcy Court"). This Settlement Agreement and the Plan are components of a potential restructuring transaction to be memorialized in a plan support agreement (the "Plan Support Agreement") entered into by and among the College and certain existing lenders or holders of securities that are signatories thereto. This Settlement Agreement shall be attached to, and incorporated into, such Plan Support Agreement. This Settlement Agreement does not contain a complete list of all the terms and conditions of the restructuring transaction contemplated in the Plan Support Agreement and does not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. Without limiting the generality of the foregoing, this Settlement Agreement and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation consistent herewith, including the Plan Support Agreement. In the event of an inconsistency between this Settlement Agreement and the definitive documentation, the provisions of such definitive documentation shall govern. This Settlement Agreement is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408, Alabama Rule of Evidence 408, and other rules of similar import.

| TERMS AND CONDITIONS OF SETTLEMENT AGREEMENT | |
|---|---|
| **Defined Terms and Capital Structure** | |
| **The College** | Judson College, Inc., a non-profit corporation |
| **Current Capital Structure** | The primary obligations of the College are as follows: |
| | (a) The Lease Agreement dated as of October 1, 2010 (the "Bond Lease") between The Educational Building Authority of the City of Marion (the "Authority"), as sub-lessor, and the College, as sublessee, issued in connection with and pledged as security for those certain Revenue Bonds, Judson College Series 2010, dated as of October 1, 2010 (the "Bonds" and the claim related thereto, the "Bond Lease Claim" and the holders of the Bonds, the "Bondholders") issued by the Authority pursuant to that certain |

1

|  | Trust Indenture dated as of October 1, 2010 (as further amended, supplemented or otherwise modified from time to time, the "Bond Indenture") by and among the Authority, as issuer, and Regions Bank, as indenture trustee (in such capacity, the "Indenture Trustee"). The outstanding principal amount currently owed on the Bonds is $9,030,000, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue. |
|  | (b) two promissory notes made by the College to the order of Marion Bank & Trust ("Marion Bank"), as the same has been modified from time to time thereafter, on which there is an outstanding principal balance of $2,698,928.23, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "Marion Bank Claim"). |
|  | (c) an unsecured line of credit agreement made by the College to the order of First Cahawba Bank ("FCB"), as the same has been modified from time to time thereafter, on which there is an outstanding principal balance of $921,790.47, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "FCB Claim"). |
|  | (d) a promissory note dated February 12, 2021, made by the College to the order of West Alabama Bank & Trust ("West Alabama Bank" and together with Marion Bank and FCB, the "Banks"), as the same has been modified from time to time thereafter, on which there is an outstanding principal balance of $1,610,207.19, plus accrued interest, fees, and costs (including attorneys' fees) which continue to accrue (the "West Alabama Bank Claim" and together with the Marion Bank Claim and the FCB Claim, the "Bank Claims"). |
|  | (e) the claims of current and past trustees, officers, employees, and representatives of the College for indemnification of attorneys' fees, costs, and expenses incurred by them in defending against any and all claims asserted against them in connection with their service to the College (collectively, the "Indemnity Claims"), including without limitation the claims asserted by and on behalf of Bondholders in the lawsuit styled *Mann et al. v. Dunkin et al.*, CV-2022-902060, filed in the Circuit Court of Jefferson County, Alabama (the "Mann Lawsuit"). |
| **Consenting Creditors** | "Consenting Bondholders" means those Bondholders (including, but not limited to, the Required Consenting Bondholders) that are signatories to this Settlement Agreement and the Plan Support Agreement, in their capacities as such. |
|  | "Consenting Banks" means all of the Banks that are signatories to this Settlement Agreement and the Plan Support Agreement. |

2

| | |
|---|---|
| | "Consenting Creditors" means the Consenting Bondholders and the Consenting Banks. |
| **Required Consenting Creditors** | "Required Consenting Bondholders" means Consenting Bondholders holding 51% or more in principal amount of the Bonds as of the time of such determination, which Consenting Bondholders shall include, but shall not be limited to, (1) all Bondholders that are named plaintiffs in the Mann Lawsuit, (2) all Bondholders that were represented at the Mediation, and (3) all Bondholders that are or have been members of the *ad hoc* Bondholders committee that has been advised by the law firm of Rumberger Kirk & Caldwell (the "Rumberger Firm") with respect to this matter (the "Ad Hoc Bondholders Committee"). |
| | "Required Consenting Banks" or "the Banks" means Marion Bank, FCB, and West Alabama Bank. |
| | "Required Consenting Creditors" means the Required Consenting Bondholders and the Required Consenting Banks. |
| **Baptist Entities** | "Baptist Entities" means (1) the Alabama Baptist State Convention (the "Convention"), (2) the State Board of Missions of the Alabama Baptist State Convention (the "State Board of Missions"), (3) The Baptist Foundation of Alabama (both in its separate legal capacity and in its capacity as trustee for certain of the External Trusts (as such term is defined below) (the "Baptist Foundation"), and (4) Rick Lance. |
| **Effective Date** | The "Plan Effective Date" shall mean the date on which all the conditions to consummation of the Plan have been satisfied in full or waived, and the Plan becomes effective. |
| **Pre-Bankruptcy Agreements** | |
| **Disposition of Campus Property** | The Consenting Creditors agree that they shall consent to the College's conveyance of the College's real and personal property that comprises its campus in Marion, Alabama (the "Campus Property") and to the release of any liens, claims, or encumbrances that any of them has or may have on such property (including any interests of the Indenture Trustee in any leaseholds thereon or therein), in consideration for cash in a net amount of not less than $1,000,000 after all applicable transaction costs (the "Campus Property Release Amount"), provided that such transaction (the "Campus Property Transaction") occur no later than the 60th day after the execution date of this Settlement Agreement by the parties (the "Campus Marketing Period"). The source of the Campus Property Release Amount may come from any source that the College has determined is available for such purpose other than any endowment funds held by the College (excluding the Designated Funds) and the Baptist Entities Plan Contribution (as such terms are defined below). |

| | |
|---|---|
| | Upon the closing of the Campus Property Transaction, the College shall disburse the Campus Property Release Amount to the Indenture Trustee and the Banks as follows:<br><br>• Fifteen percent (15.0%) of such funds shall be disbursed to the Banks, to be allocated among them on a pro rata basis (or otherwise agreed among them) and applied against their outstanding loans; and<br><br>• The remaining eighty-five percent (85.0%) of the funds shall be paid to the Indenture Trustee for disbursement in accordance with the terms, liens, and priorities of the Bond Indenture.<br><br>If the Campus Property Transaction has not closed by the end of the Campus Marketing Period, then the College shall promptly engage a broker or auctioneer reasonably acceptable to the College, the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks to market the Campus Property for sale on terms and conditions acceptable to the College, the Indenture Trustee the Ad Hoc Bondholders Committee, and the Banks. The net sale proceeds from such transaction shall be disbursed to the Indenture Trustee and the Banks in the same manner and percentages as the College was to disburse the Campus Property Release Amount upon the closing of the Campus Property Transaction.<br><br>The College shall continue to reasonably maintain the Campus Property pending its disposition either through the Campus Property Transaction or a sale as contemplated in the paragraph immediately preceding this one. Such maintenance shall include maintaining reasonably adequate insurance on the Campus Property. |
| **Forbearance of Consenting Creditors** | The Consenting Creditors shall each agree to forbear from exercising (or causing to be exercised) any and all rights and remedies against the College or any of its property and from filing or causing to be filed (either directly or indirectly) or otherwise pursuing any claims, causes of action, subpoenas, depositions, or discovery against the College or any of its past or present officers, trustees, directors, employees, attorneys, agents, or representatives, through the earlier to occur of (a) March 31, 2024 and (b) the date on which one of the conditions precedent to the effectiveness of the Plan Support Agreement is not satisfied unless such compliance with such condition is waived by the Consenting Creditors (the "Forbearance Period"). In furtherance of the foregoing, the pending lawsuits filed by the Banks, the plaintiffs in the Mann Lawsuit, and the Indenture Trustee shall be stayed until the end of the Forbearance Period. |
| **Preservation of Documents** | During the Forbearance Period and for a period of six (6) months following the end of the Forbearance Period, the College and the persons named as defendants in the Mann Lawsuit shall preserve |

| | |
|---|---|
| | (and not destroy) any records that may have relevance to the issues or claims asserted in the lawsuits filed by the Banks, the Indenture Trustee, or the plaintiffs in the Mann Lawsuit. |
| **Support of Confirmation of Plan** | The Required Consenting Creditors shall commit to voting their respective claims in favor of, and agree not to object to, confirmation of the Plan and the approval of the settlements contemplated herein and therein provided that all conditions to confirmation have been timely met. |
| **Funds of the College** | The College holds certain endowment funds (collectively, the "Restricted Funds") that are subject to donor-imposed restrictions contained in a gift instrument on the use of such funds that have become impracticable, impossible to achieve, or wasteful, or that, because of circumstances not anticipated by the donor (i.e., the current circumstances related to the College) a modification of restrictions on the use of such funds will further the purposes for which the donor made the gift to the College. The gift instrument for each such fund would need to be modified in order to permit the College to use such funds to pay its debts and obligations, including any debts and obligations owed to the Banks, the Indenture Trustee, and the Bondholders. As of February 28, 2023, the College held approximately $8,867,037 in Restricted Funds in its endowment account. |
| | The College holds certain additional endowment funds that are subject to one or more provisions that contemplate that such funds be directed to other entities unless the College uses such funds for their designated purposes (the "Designated Funds"). As of February 28, 2023, the College held approximately $1,015,898 in Designated Funds in its endowment account. |
| | The College represents it has obtained the conditional agreement of certain donors to modify the restrictions on their gifts to the College, which gifts have a cumulative approximate balance as of February 28, 2023 of $806,383 (the "Donor Conditionally Available Funds"). The College promptly shall provide the documents evidencing such conditional agreements to counsel for the Indenture Trustee. |
| | The College promptly shall take steps to invest the Restricted Funds in Treasury Bills (unless the relevant gift instrument requires a different investment), and the earned interest accrued thereon and all other income derived therefrom and gains realized thereon shall be paid to creditors pursuant to the terms of the Plan described below, subject to entry of the Proposed UPMIFA Order and the Plan Confirmation. |
| **Conditional Modification of Restrictions on Restricted Funds; UPMIFA Action** | Promptly after the parties' full execution and delivery of the Plan Support Agreement, the College shall: <ul><li>Pursue any additional, practicable efforts to solicit additional donors of Restricted Funds to agree to</li></ul> |

5

|  | conditionally modify any restrictions on their funds so that such funds become conditionally available to pay the College's debts and obligations on the terms provided for herein and in the Plan (the "<u>Conditionally Released Restricted Funds</u>"). The College promptly after obtaining any such agreements shall provide the documents evidencing such agreements to counsel for the Indenture Trustee; |
|---|---|
|  | • Contact the Office of the Attorney General of the State of Alabama (the "<u>AG</u>") to request a meeting with the AG's office and representatives of the Indenture Trustee and the Banks to solicit the AG for a commitment that the AG will not oppose the College's proposal to obtain entry of the UPMIFA Order (as such term is defined below) authorizing the College's conditional use of the Restricted Funds that have not become Conditionally Released Restricted Funds (the "<u>Remaining Restricted Funds</u>") for the payment of the College's debts and obligations on the terms described herein; |
|  | • Subject to the College obtaining the commitment of the AG that the AG will not oppose the College's proposed conditional modification of the restrictions on the Remaining Restricted Funds to authorize the College's use of the funds for the purposes and on the terms and conditions described herein, the College shall file a petition, complaint or application (the "<u>UPMIFA Petition</u>") pursuant to Alabama's version of the Uniform Prudent Management of Institutional Funds Act (the "<u>UPMIFA Action</u>") seeking the entry of an order authorizing the College's conditional use of the Remaining Restricted Funds to fund the payment of allowed creditor claims under the College's confirmed Chapter 11 Plan (the "<u>UPMIFA Order</u>"). Prior to filing, the College shall provide counsel for the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks with the UPMIFA Petition and the proposed UPMIFA Order (the "<u>Proposed UPMIFA Order</u>") for their review and comment. The Proposed UPMIFA Order shall be further subject to the approval of counsel for the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks, which consents shall not be unreasonably withheld. The UPMIFA Petition shall specify that the College seeks court approval of the conditional modification of the restrictions on the Remaining Restricted Funds to allow such Remaining Restricted Funds to be used strictly in accordance with, and without deviation from, the terms and conditions described herein. |

|  | Notwithstanding anything to the contrary herein, none of the Banks, the Ad Hoc Bondholders Committee, nor the Indenture Trustee shall move to intervene, or otherwise attempt to be appear or be heard, in the UPMIFA Action unless consented to in advance in writing by the College and its counsel. The College shall provide counsel for the Banks, the Indenture Trustee, and the Ad Hoc Bondholders Committee prompt notice of the filing of the UPMIFA Action, any material pleadings or orders in the UPMIFA Action, and any hearings scheduled in the UPMIFA Action. |
|---|---|
| **Consenting Bondholders' Direction to Indenture Trustee** | By entering into or consenting to this Settlement Agreement and the Plan Support Agreement, the Consenting Bondholders are deemed to have given direction as provided in the Indenture to the Indenture Trustee to enter into this Settlement Agreement and the Plan Support Agreement as well as to take steps necessary to perform these agreements. The Consenting Bondholders (which shall include, but not be limited to the Required Consenting Bondholders) shall provide separate written direction, consent and release as reasonably requested by the Indenture Trustee. |
| **Conditions Precedent to Settlement Agreement and Plan Support Agreement** | This Settlement Agreement, the Plan Support Agreement, and the enforceability of each of them, are subject to the following conditions, the failure of any of which conditions shall allow any of the parties hereto to terminate these agreements upon ten (10) days' written notice to the other parties via their counsel: <br><br> • The approval of this Settlement Agreement and the Plan Support Agreement by the Board of Trustees of the College no later than April 15, 2023. <br><br> • The AG's office shall have by no later than May 15, 2023 communicated, to the satisfaction of the College, the AG's commitment not to object to or otherwise oppose the relief sought in the UPMIFA Petition. <br><br> • Communication by the Indenture Trustee to the Bondholders of the material terms of this Settlement Agreement without the Indenture Trustee receiving objections by the Bondholders by a material amount of the Bondholders. <br><br> • By no later than May 30, 2023, the College shall have commenced the UPMIFA Action requesting the entry of the UPMIFA Order. Should the College file for chapter 11 bankruptcy prior to the filing of the UPMIFA Action, the College may file the UPMIFA Action in either the United States Bankruptcy Court for the Southern District of Alabama (the "Bankruptcy Court") or in the Circuit Court of Perry County, Alabama (the "State Court" and, along with the Bankruptcy Court, shall be referred to as the "UPMIFA Court"). Otherwise, the College shall file the UPMIFA Action in the State Court. |

7

|  | |
|---|---|
| | The UPMIFA Action shall seek to conditionally modify the restrictions on the Remaining Restricted Funds in the manner contemplated herein as provided for in the Proposed UPMIFA Order. |
| | • By the conclusion of the UPMIFA Action, the UPMIFA Court shall have entered the UPMIFA Order in both the form and substance of the Proposed UPMIFA Order, which Proposed UPMIFA Order shall have been reviewed and approved by the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks before submission. The UPMIFA Order shall provide for the payment from the Remaining Restricted Funds of (a) first, to the extent the Donor Conditionally Available Funds are not sufficient to pay such expenses, (i) the College's reasonable professional fees and expenses, whenever incurred, (ii) its reasonable operating and winddown expenses, and (iii) its obligations to pay Indemnity Claims that were incurred prior to the full execution of this Settlement Agreement, (b) second, $400,000 to the Judson College Foundation on the Effective Date of the Plan, and (c) finally, the College's remaining debts and obligations, including its debts and obligations to the Banks and the Indenture Trustee (for the benefit of the Bondholders), in accordance with the terms of the Plan as confirmed. |
| | For the avoidance of confusion, if the UPMIFA Order does not modify the restrictions on Remaining Restricted Funds as contemplated by the Proposed UPMIFA Order, then the College, the Indenture Trustee, the Ad Hoc Bondholders Committee, or the Banks may terminate this Settlement Agreement and the Plan Support Agreement upon written notice to the other parties, such notice to be provided within twenty-one (21) days of entry of the UPMIFA Order. |
| **The College's Beneficial Interests in Certain External Trusts** | The College holds or has held beneficial interests in, and / or historically has received income distributions from, certain external trusts (collectively, the "External Trusts") in accordance with the terms of their respective trust instruments (collectively, the "External Trust Agreements"). |
| | Notwithstanding the releases and compromises specifically contemplated herein and as part of the Plan, so long as the Plan Support Agreement is in full force and effect and has not been terminated prior to the Plan Effective Date, the College shall not compromise or release any claims against the External Trusts or the trustees thereof without the written consent of the Ad Hoc Bondholders Committee and the Indenture Trustee, which consents shall not be unreasonably withheld after reasonable disclosure by the College of pertinent information relating to the settlement. |
| **Funding of College's Operations and Wind-Down** | To fund the College's reasonable operating and wind-down costs (including professional fees and expenses) and to pay any |

8

| | |
|---|---|
| | Indemnity Claims, the College first will use the proceeds of its currently unrestricted assets and then, to the extent the College does not have sufficient funds therefrom to fund such operating and wind-down costs (including professional fees and expenses) and Indemnity Claims, shall next use any available Donor Conditionally Available Funds to cover such costs and expenses and, thereafter, may seek approval in the UPMIFA Action to use Restricted Funds to pay such operating and wind-down costs and Indemnity Claims.

Upon reasonable written request from the Indenture Trustee, the Ad Hoc Bondholders Committee, or the Banks, the College shall provide the requesting party reasonable information related to the College's wind-down financial affairs including, but not limited to, operating and wind-down costs, payments of Indemnity Claims, and the source of funds for such payments. |
| **Filing of Chapter 11 Petition by College** | |
| | The College shall file a chapter 11 petition with the Bankruptcy Court to implement the settlements described herein pursuant to the Plan after consultation with and advance notice to the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks. Notwithstanding the foregoing, the decision regarding whether to file the chapter 11 petition before or after the conclusion of the UPMIFA Action shall be subject to the sole determination of the College. |
| **Treatment of Claims and Interests under Chapter 11 Plan** | |
| **Bond Lease Claim and Bank Claims** | The Plan shall provide for the separate classification of (1) the Bond Lease Claim, (2) the Bank Claims, and (3) any other unsecured claims (the "Unsecured Claims"). The Plan shall provide that the holders of the Bond Lease Claim, Bank Claims, and Unsecured Claims shall receive on the Plan Effective Date, after payment of any and all allowed administrative and other priority claims, in full and final satisfaction of their claims,

- With respect to any Restricted Funds made available for distribution to creditors pursuant to the UPMIFA Action or otherwise and funds derived from the External Trusts (including claims of the College against the trustees of those trusts), such funds shall be disbursed as follows:

  - *First*, the Indenture Trustee shall receive a distribution to cover its actual fees and expenses incurred as a result of the defaults under the Bond documents up to a maximum amount of $700,000. Such funds shall be used by the Indenture Trustee to cover payment and/or reimbursement of all or a portion of its then outstanding fees and expenses and, to the extent |

|  |  |
|---|---|
|  | such fees and expenses are less than the distribution, such amounts shall be disbursed by the Indenture Trustee in accordance with the terms and priorities of the Bond Indenture; |
|  | ▪ *Second,* the remaining balance of such funds shall be disbursed as follows: |
|  | o 75.0% of such funds shall be paid to the Indenture Trustee for the benefit of the Bondholders and disbursed by the Indenture Trustee in accordance with the terms and priorities of the Bond Indenture; and |
|  | o 25.0% of such funds shall be paid to the Banks, to be allocated among them on a pro rata basis or as otherwise agreed among them. |
|  | • The net proceeds of any recoveries on the Retained Accountant Claims shall be paid to the Indenture Trustee for the benefit of the Bondholders. |
|  | • With respect to all other assets of the College and the net proceeds from the sale or other disposition of any assets of the College other than as expressly provided herein, such assets and net proceeds shall be disbursed *pro rata* among the Indenture Trustee (for the benefit of the Bondholders) and the Banks. |
|  | Any payments under the Plan on account of the Bond Lease Claim or otherwise on account of the Bonds or for the benefit of the Bondholders shall be disbursed to the Indenture Trustee for application by the Indenture Trustee in accordance with the applicable Bond documents. The Plan shall provide that the fees and expenses of the Indenture Trustee shall be payable out of the distributions made under the Plan on account of the Bond Lease Claim and otherwise as provided in the Bond documents. |
| **Other Provisions of the Chapter 11 Plan** | |
| **Other Provisions** | The Plan shall contain other customary and reasonable terms and conditions as agreed to by the College and the Required Consenting Creditors. |
| **Executory Contracts and Unexpired Leases** | Pursuant to the Plan, the College shall reject all of its executory contracts and unexpired leases (including the ground lease dated as of October 1, 2010, between the College, as lessor, and the Authority, as lessee (the "<u>Ground Lease</u>")). To the extent the Bond Lease has not been previously terminated or released in conjunction with the disposition of the Campus Property, the Indenture Trustee shall be deemed to have released the Bond Lease pursuant to the Plan. Nothing in the Plan shall be |

|  | construed as an admission by the Indenture Trustee or any of the Bondholders that the Bond Lease is subject to assumption or rejection under 11 U.S.C. § 365 or the lease rejection cap under 11 U.S.C. § 502(b)(6). |
|---|---|
| **Allowance of Bank Claims and Bond Lease Claim** | The Bank Claims shall be allowed as unsecured claims (except to the extent of any Bank's setoff rights, in which case such claims shall be allowed as secured claims to such extent) in the amount of each Bank's outstanding principal and accrued interest (accrued at non-default rate), as well as fees and expenses of Banks (including attorneys' fees) as provided for in the Banks' respective loan documents as of the Petition Date. |
|  | The Bond Lease Claim shall be allowed under the Plan as an unsecured claim against the College in the full amount of the outstanding principal and accrued interest (accrued at non-default rates), as well as fees and expenses of the Indenture Trustee (including attorneys' fees) as provided for in the Bond Indenture due under the Bonds as of the Petition Date and shall not be subject to the lease damages rejection cap under 11 U.S.C. § 502(b)(6). |
| **Voting of Bond Lease Claim** | Bondholders shall have the right to vote on the Plan and its proposed treatment of the Bond Lease Claim, with each Bondholder to have the right to vote their respective beneficial bond holdings as of a record date to be agreed upon by the College and the Indenture Trustee. The College and the Indenture Trustee shall cooperate with each other to solicit the votes of Bondholders with respect to the Plan in a timely and efficient matter and, to the extent feasible and practicable, shall seek to solicit such votes prior to the filing of any chapter 11 case by the College to implement such Plan. |
| **Vesting of College's Assets under Plan** | Except as provided herein or in the Plan, upon the Plan Effective Date, title to any and all remaining assets (including all claims and causes of action of the College not released by the Plan or otherwise, the books and records of the College and, if not disposed of prior to the Effective Date, the Campus Property) shall vest in a plan trust (the "Plan Trust"). The trustee of the Plan Trust (the "Plan Trustee") shall be selected by the College and shall be mutually acceptable to the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks. The Plan Trustee shall liquidate any and all such assets in the Plan Trust and disburse the net proceeds therefrom pursuant to the Plan. |
|  | Notwithstanding the foregoing, on the Plan Effective Date, the College shall transfer to the Judson Foundation certain archival and historical items regarding the College of *de minimis* value. |
|  | To the extent that any Restricted Funds do not become available for the payment of any and all debts and obligations of the College, such Restricted Funds shall remain vested in the |

| | |
|---|---|
| | College, subject to any and all restrictions thereon, pending the UPMIFA Court's determination in the UPMIFA Action of the disposition of such Restricted Funds. |
| **Tax Related Issues (Structuring & Otherwise)** | The College shall work with the Consenting Creditors and shall use good-faith efforts to structure the Plan to the maximum extent possible in a tax-efficient and cost-effective manner for the benefit of the parties to the Plan Support Agreement. |
| **Restricted Funds** | The College shall retain exclusive authority over the proposed distribution of the Restricted Funds and the modification of the restrictions thereon, except to the extent any such funds become available for the payment of any and all debts and obligations of the College, which funds shall be paid following the Plan Effective Date pursuant to the terms of this Settlement Agreement, the UPMIFA Action, and the Confirmation Order. |
| **Conditions Precedent to Confirmation of the Plan** | Confirmation of the Plan is subject to: • The Bankruptcy Court having entered an order in form and substance acceptable to the College and the Required Consenting Creditors, approving a disclosure statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code. • The Plan and all documents contained in any Plan supplement, including any exhibits, schedules, amendments, modifications or supplements thereto, having been filed in substantially final form and in form and substance acceptable to the College and also to the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks. |
| **Conditions Precedent to Consummation of the Plan** | Unless waived in writing by the College, on the one hand, and the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks, on the other hand, the occurrence of the Plan Effective Date shall be subject to the satisfaction of such conditions precedent agreed upon by the College, the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks, including, without limitation, the following: • The Plan Support Agreement shall have been assumed by the College pursuant to an order of the Bankruptcy Court and shall not have been terminated in accordance with its terms. • Negotiation, execution and delivery of definitive documentation with respect to the Plan and any Plan supplement documents, in a form and substance acceptable to the College, on the one hand, and the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks, on the other hand, and otherwise consistent with the terms and conditions described in this Settlement Agreement or the Plan Support Agreement, as applicable. |

| | |
|---|---|
| | • The UPMIFA Court shall have entered the UPMIFA Order in substantially the same form and substance as the Proposed UPMIFA Order, and the UPMIFA Order shall be final and nonappealable.<br><br>• The Bankruptcy Court shall have entered the order confirming the Plan (the "Confirmation Order") in form and substance acceptable to the College and the College, on the one hand, and the Indenture Trustee, the Ad Hoc Bondholders Committee, and the Banks, on the other hand, and the Confirmation Order shall be final and nonappealable. |
| **Payment of Legal Fees in Mann Lawsuit** | The Plan shall provide that from the Baptist Entities Plan Contribution (as herein defined), the Consenting Bondholders shall receive payment and reimbursement of legal fees and expenses in an amount not to exceed $350,000.00 (the "Consenting Bondholders Legal Fee"). |
| **Compromise and Settlement of All Claims against the Baptist Entities** | To facilitate the confirmation and consummation of the College's Plan and the settlements and releases of claims and causes of action described herein and therein, the Baptist Entities have agreed to pay, on or about the Plan Effective Date, the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) to the College, with the College to then promptly disburse such sum to the Indenture Trustee for the benefit of the Bondholders pursuant to the College's Plan (the "Baptist Entities Plan Contribution") from which the Indenture Trustee shall remit the Consenting Bondholders Legal Fee to the Rumberger Firm. |
| **Release of Certain Indemnity Claims** | Subject to the occurrence of the Effective Date of the Plan, the current and past trustees, officers, and employees of the College who are named as defendants in the Mann Lawsuit (collectively, the "Trustee Defendants") shall waive and release any and all Indemnity Claims that they have or may have for fees or expenses arising after the date of this Settlement Agreement that were incurred in connection with the Mann Lawsuit or any other matters or disputes resolved pursuant to this Settlement Agreement or the Plan. Notwithstanding the foregoing, nothing in this Settlement Agreement is intended to or shall be deemed to constitute a release of any claims for indemnification that any current or past trustee, officer, or employee of the College (including, without limitation, the Trustee Defendants) has or may have against the College for any reasonable and necessary costs and expenses he or she actually incur in defending any claims or causes of action asserted against them by any of the College Accountants (as such term is defined below). The foregoing provision does not constitute an acknowledgement that any such cross claim, third party claim or other form of claim over against Trustee Defendants is cognizable under applicable law. If the Trustee Defendants do become the subject of any claims or causes of action asserted by any of the College |

13

| | |
|---|---|
| | Accountants or any other Bondholder, then the Trustee Defendants shall, if they wish to seek indemnification from the College for any costs and defenses incurred in defending such claims, collectively retain and be solely defended by (to the extent ethically possible) by one law firm retained in common as they shall mutually select. |
| **Releases** | As an integral part of the global settlement among all Parties described in this Settlement Agreement and the Plan Support Agreement, the Plan and Confirmation Order shall contain, effective as of the Plan Effective Date: (A) comprehensive, global releases of (1) all claims and causes of action of the College and its past and present trustees and officers against any and all of the Bondholders, the Indenture Trustee, the Banks, the Baptist Entities, the External Trusts for which the Baptist Foundation serves as Trustee, their insurer(s), and each of their respective affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, (2) all claims and causes of action of any creditors (including all past and present Bondholders, the Indenture Trustee, the Banks, and the Baptist Entities) against the College, its past and present trustees, officers, directors, employees, attorneys, consultants, agents, representatives, any entities that have issued bonds for the benefit of the College, successors, and assigns, other than the Retained Claims (as such term is defined below), in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bonds, the Indenture, the Bond Lease, the Bank Claims, the Indemnity Claims, any other Bond document, or the claims asserted or that could have been asserted in the Mann Lawsuit, the lawsuit filed by the Indenture Trustee against the College pending in the Circuit Court of Perry County, Alabama, or the lawsuit filed by the Banks against the College pending in the Circuit Court of Perry County, Alabama, (3) all claims and causes of action of any creditors (including all past and present Bondholders, the Indenture Trustee, and the Banks) against each of the Baptist Entities, the External Trusts for which the Baptist Foundation serves as Trustee, their insurer(s), and each of their respective affiliates, trustees, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bank Claims, the Indemnity Claims, the External Trusts for which the Baptist Foundation serves as Trustee, or the claims asserted or that could have been asserted in the Mann Lawsuit, (4) all claims and causes of action between or among the holders of any of the Bonds and the Indenture Trustee, on the one hand, and the Banks, on the other, in any way related to or arising out (whether directly or indirectly) of the Bond Lease Claim, the Bank Claims, the Indemnity Claims, or the claims asserted or that |

14

could have been asserted in the Mann Lawsuit, (5) all claims and causes of action of any past or present Bondholders against the Indenture Trustee, it affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors and assigns, in any way related to or arising out of (whether directly or indirectly) the Bond Lease Claim, the Bonds, the Indenture, the Bond Lease, or any other Bond document, including but not limited to, claims for any action or inaction pertaining to their services for the Indenture Trustee and arising out of and directly or indirectly related to or connected with the compliance by the Indenture Trustee with this Settlement Agreement or in taking or not taking the direction of the Consenting Bondholders herein, (6) all claims and causes of action of the College trustees, officers, directors, employees, attorneys, consultants, agents, representatives, successors and assigns named in the Mann lawsuit against the Baptist Entities, the External Trusts for which the Baptist Foundation serves as Trustee, their insurer(s), and each of their respective affiliates, officers, directors, employees, attorneys, consultants, accountants, agents, representatives, successors, and assigns, and (7) all claims and causes of action of each of the Baptist Entities, and their respective past and present trustees, officers, and directors against the Indenture Trustee, the Consenting Bondholders, and the Banks in any way related to or arising out of (whether directly or indirectly) the Bond Lease Claim, the Bonds, the Bond Lease, the Indenture, or any of the Bank Claims. As these releases are a material part of the comprehensive settlement described herein and to be made the foundation of the Plan, the releases shall be binding on all proposed parties thereto and the Plan shall not provide for any opt-outs.

The Plan shall further provide for the release of all preference and other "avoidance actions" of the College's bankruptcy estate against the Indenture Trustee, the Bondholders, the Banks, the Baptist Entities and their insurer(s), the External Trusts for which the Baptist Foundation serves as trustee, the Judson Foundation, the Parker, Hudson, Rainer and Dobbs, L.P. law firm of the mediator Ed Dobbs, and all of the College's past and present trustees, officers, directors, employees, attorneys, accountants, other agents and representatives.

For avoidance of doubt, the Plan shall not provide for the release of any claims or causes of action of the College, the Bondholders, the Indenture Trustee, the Banks, or any other party against (i) the External Trusts and the trustees of such External Trusts (including, without limitation, Trustmark Bank as trustee and Robertson Banking Company as trustee), other than those External Trusts for which any of the Baptist Foundation serves as trustee (which shall be released effective on the Plan Effective Date as set forth above), (ii) the

15

| | |
|---|---|
| | accountants and accounting firms (the "College Accountants") who have performed work for the College, Jo Anne Morina CPA, Haynes Downard, LLP, and Brannum CPA (the "Retained Accountant Claims"), or (iii) the College's insurers (including without limitation Indian Harbor Insurance Company or AXA XL), all of which claims and causes of action (collectively, the "Retained Claims") shall be specifically retained and reserved and shall vest in the Plan Trust on the Plan Effective Date. Any releases delivered hereunder shall contain appropriate "pro tanto" language to preserve the claims and causes of action described in the preceding sentence as retained, reserved and vested in the Plan Trust. In consideration of the releases contained in the Plan, upon the occurrence of the Plan Effective Date, the defendants in the Mann Lawsuit agree to cooperate reasonably with the Plan Trustee's requests for discovery in connection with pursuit of any claims against the non-released entities identified in paragraphs (i), (ii), and (iii). |
| **Dismissal of Lawsuits** | Upon the Plan Effective Date, the Banks, the Indenture Trustee, and the plaintiffs in the Mann Lawsuit shall all cause their pending lawsuits to be promptly dismissed with prejudice as against all defendants therein, each party to bear its own fees and costs, in consideration of terms of this Settlement Agreement, the Plan Support Agreement, and the Plan. |
| **Exculpation and Injunctions** | The Plan shall contain customary exculpation and injunction provisions. |
| **Causes of Action of the College** | The College shall retain all rights to commence and pursue any causes of action with respect to the Restricted Funds, including any UPMIFA Action.<br><br>Excluding (1) any causes of action released by the College pursuant to the release and exculpation provisions outlined in this Settlement Agreement and the Plan Support Agreement and (2) any causes of action expressly retained by the College, all other causes of action of the College shall vest in the Plan Trustee on the Plan Effective Date. |
| **Consent of Ad Hoc Bondholders Committee; Notice to Ad Hoc Bondholders Committee.** | To the extent the consent or approval of the Ad Hoc Bondholders Committee is required by any provision of this Settlement Agreement, that requirement shall be satisfied upon the Rumberger Firm's delivery of written notice to counsel for the College that the Ad Hoc Bondholders Committee has consented to or approved such matter. To the extent that this Settlement Agreement requires that the College give notice to or consult with the Ad Hoc Bondholders Committee, such requirement may be satisfied by counsel for the College giving notice to or consulting with the Rumberger Firm about such matter. |

| | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Settlement Agreement or the Plan, all notes, instruments, certificates, and other documents evidencing claims or interests, including all of the Bonds and all of the Banks' notes, shall be cancelled, and the obligations of the College thereunder or in any way related thereto shall be deemed satisfied in full and discharged; provided, however, that any such agreements (including, but not limited to the Bonds) shall continue in effect solely to allow holders of Claims to receive distributions under the Plan, allow holders of claims to retain their respective rights and obligations *vis-à-vis* other holders of claims pursuant to applicable governing documents, and as except as may be necessary to seek standing to assert causes of action vested in the Plan Trustee. |
| **Continued Existence of College** | The Plan shall provide for the continued existence of the College after the Plan Effective Date. |
| **Dismissal of Chapter 11 Case if Plan Not Confirmed** | If the College files for chapter 11 bankruptcy to implement the Plan containing the settlements and agreements contained herein but, for any reason, the Plan is not confirmed on or before March 31, 2024, then the parties hereto agree that they shall support and not oppose any motion filed by the College to dismiss such chapter 11 case. |
| **Miscellaneous Other Provisions** | |
| **No Admission** | Nothing in the Settlement Agreement is or shall be deemed to be an admission of any kind. |
| **Choice of Law; Venue** | This Settlement Agreement shall be governed by Alabama law. Any litigation or proceeding as between or among any of the parties with respect to this Settlement Agreement shall be brought in the applicable federal or state court in and for Perry County, Alabama, which courts shall be the exclusive courts of jurisdiction and venue; provided, however, that during the pendency of any chapter 11 case for the College, the bankruptcy court exercising jurisdiction over that case shall have exclusive jurisdiction over any and all such litigation or proceedings. Notwithstanding the foregoing, nothing in this Settlement Agreement is intended to or shall waive or impair any argument that any party has or may have with respect to the venue of the Mann Lawsuit so long as such suit remains pending. |
| **Confidentiality** | The terms of the parties' agreement shall remain confidential and no party shall disclose any such information without other parties' written consent. Notwithstanding the foregoing, confidential information regarding this settlement may be disclosed (a) by the parties to their respective attorneys, accountants and other advisors (provided such third parties agree to maintain confidentiality on the same terms), (b) by the |

|  | Indenture Trustee to solicit the support of Bondholders to this Settlement Agreement and the Plan Support Agreement, (c) by the College and the Indenture Trustee to solicit the support of Bondholders and other creditors to the Plan, (d) by the Consenting Bondholders to other Bondholders to solicit the support of Bondholders to this Settlement Agreement and the Plan Support Agreement and the Plan, and (e) by the parties to the extent such confidential information is required to be disclosed by court order, subpoena, or other judicial or legal process. |
|---|---|
| **Successors and Assigns.** | This Settlement Agreement is intended to bind and inure to the benefit of the parties and their respective successors and permitted assigns, as applicable. The Consenting Bondholders and the Banks each acknowledge and agree that they shall not assign their interests in any of their claims to any party unless such transferee acknowledges and agrees in advance in writing to be bound to the terms of this Settlement Agreement. |

ACKNOWLEDGED AND ACCEPTED BY:

_____
Judson College

_____
Regions Bank, Indenture Trustee for Bondholders

_____
Marion Community Bank

_____
West Alabama Bank & Trust

_____
First Cahawba Bank

**[REMAINING SIGNATURE PAGES OMITTED]**

19

**EXHIBIT C**

**Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This **Plan Support Agreement** (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of December 15, 2023, is entered into by and among: (i) **Judson College, Inc.**, an Alabama non-profit corporation (the "**College**" or "**Debtor**"), (ii) **Marion Bank & Trust n/k/a Marion Community Bank** ("**Marion Bank**"), an Alabama banking corporation and the holder of one or more promissory notes evidencing an outstanding loan or loans to the Debtor (whether one or more, the "**Marion Bank Loans**"), (iii) **First Cahawba Bank** ("**FCB**"), an Alabama banking corporation and the holder of one or more promissory notes evidencing an outstanding loan or loans to the Debtor (whether one or more, the "**FCB Loans**"); (iv) **West Alabama Bank & Trust** ("**West Alabama Bank**," and, together with Marion Bank and FCB, the "**Banks**" or the "**Consenting Banks**"), an Alabama banking corporation and the holder of one or more promissory notes evidencing an outstanding loan or loans to the Debtor (whether one or more, the "**West Alabama Bank Loans**" and, together with the Marion Bank Loans and the FCB Loans, the "**Loans**"); (v) the undersigned beneficial holders (the "**Bondholders**" and together with their respective successors and permitted assigns and any subsequent bondholder that becomes party hereto in accordance with the terms hereof, the "**Consenting Bondholders**") of the Revenue Bonds, Judson College Series 2010, dated as of October 1, 2010 (the "**Bonds**"), issued by The Educational Building Authority of the City of Marion (the "**Authority**") pursuant to that certain Trust Indenture dated October 1, 2010 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Bond Indenture**") by and between the Authority and Regions Bank, as indenture trustee, (vi) **Regions Bank**, as indenture trustee under the Bond Indenture (the "**Indenture Trustee**"), (vii) the undersigned current and former trustees, employees, and representatives of the College who have asserted claims for indemnification against the College for claims and causes of action asserted against them with respect to the issuance of the Bonds (the "**Indemnity Claimants**" or the "**Consenting Indemnity Claimants**", and, together with the Consenting Banks, the Consenting Bondholders, and the Indenture Trustee, the "**Consenting Creditors**"), (viii) **The Alabama Baptist State Convention** (the "**Convention**"), (ix) **The State Board of Missions of the Alabama Baptist State Convention** (the "**State Board of Missions**"), (x) **The Baptist Foundation of Alabama** (both in its separate legal capacity and in its capacity as trustee for certain of the External Trusts (the "**Baptist Foundation**"), and (xi) **Rick Lance** (who, collectively with the Convention, the State Board of Missions, and the Baptist Foundation shall be referred to the "**Baptist Entities")**. The Debtor, the Consenting Creditors, the Baptist Entities, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are each referred to herein as a "**Party**" and collectively as the "**Parties.**"

**WHEREAS**, the Parties have engaged in good faith, arms'-length negotiations resulting in the execution by the Parties of the Confidential Mediation Settlement Document (the "**Comprehensive Mediation Settlement Agreement**") attached hereto as Exhibit "A" and agreed to enter into certain compromises, settlements, and transactions (collectively, the "**Restructuring**") in accordance with the terms and conditions set forth in (1) this Agreement, (2) the Chapter 11 plan for the Debtor attached hereto as Exhibit "B" and incorporated herein by reference (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including any exhibits or schedules attached thereto, the "**Plan**"),

1

and (3) the disclosure statement attached hereto as Exhibit "C" and incorporated herein by reference (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including any exhibits or schedules attached thereto, the **"Disclosure Statement"**).

**WHEREAS**, the Restructuring shall be implemented through the commencement by the Debtor of a voluntary case (the **"Chapter 11 Case"**) under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the **"Bankruptcy Code"**), in the United States Bankruptcy Court for the Southern District of Alabama (the **"Bankruptcy Court"**), and a solicitation of votes for the Plan pursuant to the Bankruptcy Code (the **"Solicitation"**).

**WHEREAS**, as of the date hereof, each of the Consenting Banks holds, in the aggregate, all of the outstanding principal amount due and owing by the College under their respective Loans.

**WHEREAS**, as of the date hereof, the Consenting Bondholders hold beneficially, in the aggregate, more than sixty-two percent (62%) of the aggregate outstanding principal amount of all claims against the Debtor arising on account of the Bonds (the **"Bond Claims"** or the "**Bond Lease Claims**").

**WHEREAS**, as of the date hereof, each of the Consenting Indemnity Claimants holds, in the aggregate, more than two-thirds of the aggregate outstanding amount of Indemnity Claims.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, covenant and agree as follows:

    1.   Certain Definitions. As used in this Agreement, the following terms have the following meanings:

        (a)   **"Definitive Documentation"** means the documents (including any related agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Restructuring, including this Agreement, the Plan, the Disclosure Statement, the Plan Trust Agreement, and the Confirmation Order.

        (b)   **"Plan Effective Date"** means the date upon which the Plan is effective.

        (c)   **"Requisite Consenting Creditors"** means, (a) with respect to the Banks, each of the Consenting Banks, (b) with respect to the Bondholders, (i) Consenting Bondholders holding beneficially in the aggregate more than sixty-two percent (62%) of the aggregate outstanding principal amount of the Bond Claims and (ii) the Indenture Trustee, and (c) with respect to the Indemnity Claimants, each of the Indemnity Claimants.

        (d)   **"Support Effective Date"** means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Debtor and (ii) all of the Requisite Consenting Creditors and other Parties.

    2.   Plan. The Plan is expressly incorporated herein and made a part of this Agreement. The terms and conditions of the Restructuring are set forth in the Plan; provided that the Plan is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies

2

between the terms of this Agreement and the Plan, the Plan shall govern. Capitalized terms used but not defined in this Agreement shall have the same meanings assigned to such terms in the Plan.

3. <u>Bankruptcy Process</u>.

(a) <u>Commencement of the Chapter 11 Case</u>. The Debtor hereby agrees that, as soon as reasonably practicable, but in no event later than January 8, 2024 (the date on which the filing of the Chapter 11 Case occurs, the **"Petition Date"**), the Debtor shall file with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of the Debtor.

(b) <u>Filing of the Plan</u>. On the Petition Date, the Debtor shall file with the Bankruptcy Court the Plan and the Disclosure Statement as the same may be amended in accordance with the terms of this Agreement.

(c) <u>Confirmation of the Plan</u>. The Debtor shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement; each Consenting Creditor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(d) <u>Amendments and Modifications of the Plan</u>. Each of the Parties agrees to negotiate in good faith all amendments and modifications to the Plan, as reasonably necessary and appropriate to obtain Bankruptcy Court confirmation of the Plan pursuant to the Confirmation Order of the Bankruptcy Court; <u>provided</u> that (1) the Consenting Creditors shall have no obligation to agree to any modification that (A) is inconsistent with the Plan in any material respect, (B) creates any new material obligation on any Consenting Creditor, or (C) adversely changes or otherwise adversely affects the economic treatment of such Consenting Creditor (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by the Consenting Creditors under the Plan shall be deemed to adversely affect the Consenting Creditors, as applicable) whether such change is made directly to the treatment of the Banks, the Bondholders, the Indemnity Claimants, or otherwise, and (2) the Baptist Entities shall have no obligation to agree to any modification that (A) is inconsistent with the Plan in any material respect, (b) creates any new material obligation on any Baptist Entity or in any respect adversely alters the Baptist Entities' obligations with respect to the Baptist Entities Plan Contribution. Notwithstanding the foregoing, the Debtor may amend, modify or supplement the Plan, from time to time, without the consent of any Consenting Creditor or Baptist Entity, to cure any ambiguity, defect (including any technical defect) or inconsistency, <u>provided</u> that any such amendments, modifications or supplements do not adversely affect the rights, interests or treatment of such Consenting Creditor or Baptist Entity under the Plan.

(e) <u>Participation in the Chapter 11 Case</u>. Nothing in this Agreement shall limit any Party's rights to: (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Case, so long as such appearance and positions advocated in

3

connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

4.     Agreements of the Consenting Creditors.

(a)     So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Creditor agrees that it shall, subject to the receipt by such Consenting Creditor of the Disclosure Statement and other solicitation materials in respect of the Plan:

(i)     timely vote or cause to be voted, all of its claims against the Debtor to accept the Plan and to consent to the release through the Plan of certain Causes of Action (as such term is defined in the Plan) that holders of claims in the same class as the Consenting Creditor's claims under the Plan have or may have, by delivering its duly executed and completed ballots accepting the Plan and granting the release on a timely basis following the commencement of the Solicitation; provided that such vote and release may be immediately revoked and deemed void *ab initio* by such Consenting Creditor upon termination of this Agreement prior to the confirmation of the Plan pursuant to the terms hereof;

(ii)     not change, revoke, or withdraw (or cause to be changed, revoked, or withdrawn) any such vote or release described in clause (i) above;

(iii)     not (A) object to, delay, postpone, challenge, reject, oppose, impede, or take any other action that would reasonably be expected to prevent, interfere with, delay or impede, directly or indirectly, in any material respect, the approval, acceptance, or implementation of the Restructuring on the terms set forth in the Plan, (B) directly or indirectly solicit, encourage, propose, file with the Bankruptcy Court, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, proposal or offer of dissolution, winding up, liquidation, or plan of reorganization for the Debtor other than the Plan, or (C) otherwise take any action that could in any material respect interfere with, delay, or postpone the consummation of the Restructuring;

(iv)     not direct any administrative agent, collateral agent, or indenture trustee (as applicable), including the Indenture Trustee, to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts to request that such administrative agent, collateral agent, or indenture trustee cease and refrain from taking any such action (but shall not be required to incur any indemnification obligations in respect of such request or otherwise); and

(v)     support and take all commercially reasonable actions necessary or reasonably requested by the Debtor or Debtor's bankruptcy counsel to facilitate the Solicitation, approval of the Disclosure Statement, and confirmation and

4

consummation of the Plan (it being understood that the Consenting Creditors shall not be required to incur any material costs, expense, or liability in connection therewith).

(b)    <u>Restrictions on Transfers</u>. Each Consenting Creditor agrees that it shall not directly or indirectly, in whole or in part, sell, contract to sell, give, participate, encumber, grant a security interest in, offer, sell any option or contract to purchase, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a **"Transfer"**), any of its Claims or any option thereon or any right or interest therein or any other Claims against in the Debtor (collectively, the **"Claims"**) (including the grant of any proxies, the deposit of any Claims into a voting trust, or the entry into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Consenting Creditor, or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims it already may hold against the Debtor prior to such Transfer) by executing a joinder agreement substantially in the form attached hereto as <u>Exhibit "C"</u> (a **"Joinder Agreement"**), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Jay Bender and James Bailey, Bradley Arant Boult Cummings LLP, counsel to Judson College, Inc., email: jbender@bradley.com and jbailey@bradley.com, and Alexandra Garrett, Silver Voit & Garrett, P.C., counsel to Judson College, Inc., email: agarrett@silvervoit.com (collectively, **"Debtor's' Counsel"**), and (ii) all other counsel listed in Section 23 below, in which event (A) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations, in each case for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 6. Each Consenting Creditor agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Debtor and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(c)    <u>Additional Claims</u>. Nothing herein shall be construed to restrict a Consenting Creditor's right to acquire Claims after signing this Agreement. Each Consenting Creditor agrees that if any Consenting Creditor acquires additional Claims, then (i) such Claims shall be subject to this Agreement (including the obligations of the Consenting Creditors under this Section 4), and (ii) following such acquisition, such Consenting Creditor shall notify Debtor's Counsel of the amount and types of claims it has acquired (A) on no less than a monthly basis, and (B) additionally, upon the reasonable request of Debtor's Counsel.

(d)    <u>Forbearance</u>. During the period commencing on the date hereof and ending on the termination of this Agreement in accordance with its terms, each Consenting Creditor and the Indenture Trustee hereby agree to forbear from the exercise of any rights or remedies it may have under their respective loan and credit agreement, the Indenture, or any other document and under applicable United States or foreign law or otherwise. For

5

the avoidance of doubt, the forbearance set forth in this Section 4(d) shall not constitute a waiver with respect to any defaults or events of default under any of the documents evidencing any of the Loans or under the Indenture, the Bond Lease, or any other documents executed in connection with the issuance of the Bonds, and shall not bar any Consenting Creditor from filing a proof of claim in the Chapter 11 Case or taking action to establish the amount of such Claims. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Creditor or the Indenture Trustee, or the ability of each of the Consenting Creditors or the Indenture Trustee to protect and preserve their respective rights, remedies, claims, and interests, including their respective claims against the Debtor. If the transactions contemplated hereby are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

(e)     The covenants and agreements of the Consenting Creditors in this Section 4 are several and not joint.

5.     <u>Agreements of the Debtor.</u>

(a)     <u>Solicitation and Confirmation</u>. The Debtor agrees to (i) act in good faith and use commercially reasonable efforts to support and successfully complete the Solicitation in accordance with the terms of this Agreement, and (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 6), in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the board of trustees, managers, members, or partners, as applicable, of the Debtor; <u>provided</u> that the Debtor shall not be obligated to agree to any modification of any document that is inconsistent with the Plan.

(b)     <u>Certain Additional Chapter 11 Related Matters</u>. The Debtor shall provide draft copies of all material motions or applications and other documents relating to the Plan, Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, and all first day pleadings that the Debtor intends to file with the Bankruptcy Court to the Consenting Banks' Counsel, the Indenture Trustee's Counsel, and the Consenting Bondholders' Counsel, if reasonably practicable, at least two (2) days prior to the date when the Debtor intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

6.     <u>Agreements of the Baptist Entities.</u>

(a)     So long as this Agreement has not been terminated in accordance with the terms hereof, the Baptist Entities agree that they shall:

(i)     not (A) object to, delay, postpone, challenge, reject, oppose, impede, or take any other action that would reasonably be expected to prevent, interfere with, delay or impede, directly or indirectly, in any material respect, the approval,

6

acceptance, or implementation of the Restructuring on the terms set forth in the Plan, (B) directly or indirectly solicit, encourage, propose, file with the Bankruptcy Court, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, proposal or offer of dissolution, winding up, liquidation, or plan of reorganization for the Debtor other than the Plan, or (C) otherwise take any action that could in any material respect interfere with, delay, or postpone the consummation of the Restructuring;

      (ii)    support and take all commercially reasonable actions necessary or reasonably requested by the Debtor or Debtor's bankruptcy counsel to facilitate approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Baptist Entities shall not be required to incur any material costs, expense, or liability in connection therewith).

      (b)    on or before the Plan Effective Date, the Baptist Entities shall pay the Baptist Entities Plan Contribution in Cash as contemplated by the Plan.

    7.    <u>Termination of Agreement</u>.

This Agreement shall automatically terminate three (3) business days following the delivery of written notice to the other Parties (in accordance with Section 22) from all of the Requisite Consenting Creditors at any time after and during the continuance of any Creditor Termination Event. In addition, this Agreement shall automatically terminate three (3) business days following delivery of notice from the Debtor to all of the Consenting Creditors (in accordance with Section 22) at any time after the occurrence and during the continuance of any Debtor Termination Event (as defined below). This Agreement shall terminate automatically on the Plan Effective Date without any further required action or notice.

      (a)    <u>Mutual Termination</u>. This Agreement and the obligations hereunder may be terminated by mutual agreement of the Debtor and all of the Requisite Consenting Creditors upon the receipt of written notice delivered in accordance with Section 22.

      (b)    A **"Creditor Termination Event"** shall mean any of the following:

      (i)    The breach in any material respect by the Debtor of any of the undertakings, representations, warranties, or covenants of the Debtor set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Requisite Consenting Creditors pursuant to this Section 6 and in accordance with Section 22 (as applicable).

      (ii)    On January 9, 2023, unless the Debtor has commenced the Chapter 11 Case by such date.

      (iii)    On the date that is two (2) business days after the Petition Date, unless the Debtor has filed the Plan, the Disclosure Statement, and the motion to schedule hearings for approval of the Disclosure Statement and confirmation of the Plan.

7

(iv)     On April 1, 2024, if the Bankruptcy Court shall not have entered an order confirming the Plan by such date.

(v)     On April 30, 2024 (the **"Outside Date"**), if the Plan Effective Date has not occurred by such date.

(vi)     The Debtor withdraws the Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after the Debtor receives written notice from any of the Requisite Consenting Creditors (in accordance with Section 21) that such motion or pleading is inconsistent with this Agreement, and (B) entry of an order of the Bankruptcy Court approving such motion or pleading.

(vii)     The Debtor files any motions, pleadings, or applications for approval of (A) employee benefits or compensation, pursuant to the Bankruptcy Code, (B) a key employee incentive or retention plan, and/or (C) assumption or rejection of any executory contract that is not provided for or consistent with the Plan, this Agreement or in the first day motions, in each case, without the prior written consent of the Requisite Consenting Creditors.

(viii)     An examiner or a trustee shall have been appointed in the Chapter 11 Case.

(ix)     The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any materially adverse respect.

(x)     The Debtor files, propounds, or otherwise supports any Chapter 11 plan that is inconsistent with this Agreement in any material respect.

(xi)     The occurrence of an Other Termination Event (as defined in Section 6(d)).

(c)     A **"Debtor Termination Event"** shall mean any of the following:

(i)     The breach in any material respect by one or more of the Consenting Creditors of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein which remains uncured for a period of five (5) business days after the receipt by all of the Consenting Creditors of written notice of such breach pursuant to Section 22.

(ii)     The board of trustees of the Debtor reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

8

(iii) Any of the Consenting Banks no longer own at least two-thirds of their respective Loans unless each transferee of any of the Loans becomes a Consenting Creditor pursuant to Section 4(b).

(iv) The Consenting Bondholders no longer beneficially own at least sixty-two percent (62.0%) of the outstanding principal amount of the Bonds unless each transferee of any of the Bonds held beneficially by the Consenting Bondholders becomes a Consenting Creditor pursuant to Section 4(b).

(v) The occurrence of the Outside Date or an Other Termination Event.

(d) Other Termination Events. An **"Other Termination Event"** shall mean the following:

(i) The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment, or order has not been not stayed, reversed, or vacated within twenty (20) business days after such issuance.

(ii) On the date that the Chapter 11 Case shall have been converted to a case under Chapter 7 of the Bankruptcy Code, or such case shall have been dismissed by order of the Bankruptcy Court (unless caused by a default by any Consenting Creditor of its obligations hereunder, in which event the Consenting Creditors shall not have the right to terminate under this clause (ii)).

(iii) On the date that an order is entered by the Bankruptcy Court or a Court of competent jurisdiction denying confirmation of the Plan (unless caused by a default by any Consenting Creditor of its obligations hereunder, in which event the Consenting Creditors shall not have the right to terminate under this subsection) or refusing to approve the Disclosure Statement, provided that neither the Debtor nor the Consenting Creditors shall have the right to terminate this Agreement pursuant to this clause (c)(iii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement that would not have a material adverse effect on the recovery or treatment that the Consenting Creditors would receive as compared to the recovery they would have otherwise received pursuant to the Plan.

(iv) On January 6, 2024, if the Support Effective Date shall not have occurred.

Notwithstanding the foregoing, any of the dates set forth in this section may be extended by agreement among the Debtor and the Requisite Consenting Creditors.

(e) Effect of Termination. Subject to the provisions contained in Section 15, upon the termination of this Agreement in accordance with this Section 7, this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise

9

provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(f)     Automatic Stay. The Debtor acknowledges that after the commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

8.     Definitive Documentation; Good Faith Cooperation; Further Assurances.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the Restructuring, as well as the negotiation, drafting, execution, and delivery of the Definitive Documentation. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

9.     Representations, Warranties, and Covenants.

(a)     Each Party represents, warrants, and covenants as to itself only, severally (and not jointly), to each other Party. that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)     Such Party is validly existing and in good standing under the laws of the state of its incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder. The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part. If such Party is an individual, such Party is legally competent or otherwise authorized on such individual's behalf to enter into this Agreement.

(ii)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other

10

similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(iii)     The execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC or other regulatory body.

(iv)     The execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Debtor, for the filing of the Chapter 11 Case.

(b)     Each Consenting Creditor severally (and not jointly) represents and warrants to the Debtor that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the owner of the aggregate principal amount of the Loans, beneficial interests in the Bonds, or Indemnity Claims, as applicable, set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owner(s) of such Loans, Bonds, or Claims, as applicable, (A) sole investment or voting discretion with respect to such Loans, Bonds, or Claims, (B) full power and authority to vote on and consent to matters concerning such Loans, Bonds, or Claims, or to exchange, assign, and Transfer such Loans, Bonds, or Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

10.     <u>Disclosure; Publicity</u>. The Debtor shall submit drafts to the Consenting Banks' Counsel, Consenting Bondholders' Counsel, the Indenture Trustee's Counsel, the Consenting Indemnity Claimants' Counsel, and the Baptist Entities' Counsel of any press releases, public documents, and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) days prior to making any such disclosure and shall work in good faith with such parties to address any objections to statements contained therein. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Debtor and any Consenting Creditor, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Debtor, the principal amount or percentage of Loans, Bonds, or Claims, as the case may be, held by any Consenting Creditor, in each case, without such Consenting Creditor's prior written consent; <u>provided</u> that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of

11

Loans, Bonds, or Indemnity Claims, as applicable held by all the Consenting Banks, Consenting Bondholders, and Consenting Indemnity Claimants, collectively, and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person. Notwithstanding the provisions in this Section 10, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

11.  <u>Amendments and Waivers</u>. Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Debtor and the Requisite Consenting Creditors.

12.  <u>Effectiveness</u>. This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; <u>provided</u> that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings of the Loans, Bonds, or Indemnity Claims, and (b) the Debtor, the Debtor's Counsel, and other advisors in an unredacted form (to be held by Debtor's Counsel and such other advisors on a professionals' eyes only basis). For the avoidance of doubt, no affiliate of a Lender, Bondholder, Indenture Trustee, or other Consenting Creditor or other business unit within any Lender, Bondholder, Indenture Trustee, or other Consenting Creditor shall be subject to this Agreement unless they separately become a party thereto.

13.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of Alabama, without giving effect to the conflict of laws principles thereof. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding (each, a "**Proceeding**") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the State of Alabama, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Alabama courts for itself and with respect to its property, generally and unconditionally, with regard to any such Proceeding arising out of or relating to this Agreement and the Restructuring. Each of the Parties agrees not to commence any Proceeding relating hereto or thereto except in the Alabama courts, other than Proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any Alabama court. Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that a Proceeding in any Alabama court is brought in an inconvenient forum or the venue of such Proceeding is improper. Notwithstanding the foregoing, during the pendency of the Chapter 11 Case, all Proceedings contemplated by this Section 12(a) shall be brought in the Bankruptcy Court.

(B)  **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL**

12

**BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).**

14.    Specific Performance/Remedies. Each Party hereto recognizes and acknowledges that a breach by a Party of any covenants or agreements contained in this Agreement would cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy. Each Party hereby waives any requirement for the security or posting of any bond or similar instrument in connection with such remedies.

15.    Survival. Notwithstanding the termination of this Agreement pursuant to Sections 7, Sections 10-11, 13-22, and 26 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.    Preservation of Documents. In accordance with the Settlement Document, the College and the defendants in the Mann Lawsuit shall preserve (and not destroy) any records that may have relevance to the issues or claims asserted in the lawsuits filed by the Banks, the Indenture Trustee, or the plaintiffs in the Mann Lawsuit until the earlier of (a) the Plan Effective Date or (b) September 30, 2024.

17.    Headings. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

18.    Successors and Assigns; Severability. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided that nothing contained in this Section 16 shall be deemed to permit Transfers of the Loans, the Bonds, or any Claims other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

19.    Several, Not Joint, Obligations. The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint, including among the various Consenting Creditors.

20.    Relationship Among Parties. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary

13

hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtor and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

21.　<u>Prior Negotiations; Entire Agreement</u>. This Agreement, including the exhibits and schedules hereto (including the Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Debtor and each Consenting Creditor prior to the execution of this Agreement shall continue in full force and effect.

22.　<u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

23.　<u>Notices</u>. All notices hereunder shall be in writing and delivered by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(a)　If to the Debtor, to:

Judson College
Attn: President
302 Bibb Street
Marion, AL 36756

With a copy (which shall not constitute notice) to:

Jay Bender
James Bailey
Bradley Arant Boult Cummings LLP
1819 5th Avenue North
Birmingham, AL 35203
Emails: jbender@bradley.com; jbailey@bradley.com

- and -

Alexandra Garrett
Silver Voit, Garrett, & Watkins P.C.
4317-A Midmost Drive
Mobile, AL 36609
Email: agarrett@silvervoit.com

14

(b)     If to a Consenting Creditor or a transferee thereof, to the addresses, facsimile numbers, or electronic mail addresses set forth below such Consenting Creditor's signature hereto (or as directed by any transferee thereof), as the case may be, with copies to:

> Patrick L.W. Sefton
> Capell & Howard, P.C.
> Post Office Box 2069
> Montgomery, AL 36102
> Email: pat.sefton@chlaw.com
> *Counsel for Marion Community Bank*

> James B. McNeill, Jr.
> Hobbs & Hain, P.C.
> Post Office Box 1190
> Selma, AL 36702
> Email: jbm@hhpclaw.com
> *Counsel for First Cahawba Bank*

> Robert P. Reynolds
> Reynolds, Reynolds & Little, LLC
> 2115 11th Street
> Post Office Box 2863
> Tuscaloosa, AL 35403-2863
> Email: rreynolds@rrllaw.com
> *Counsel for West Alabama Bank and Trust*

> Debra Lewis
> Jeremy L. Retherford
> Balch & Bingham LLP
> 1901 Sixth Avenue North, Suite 1500
> Birmingham, Alabama 35203
> Email: dlewis@balch.com; jretherford@balch.com
> *Counsel for Regions Bank, as Indenture Trustee*

> Michael Rediker
> Scott Williams
> Rumberger Kirk
> 1300 Park Place
> Suite 1300
> Birmingham, AL 35203
> Email: mrediker@rumberger.com; swilliams@rumberger.com
> *Counsel for Consenting Bondholders*

> Bruce Rogers

Sela Stroud Blanton
Bainbridge Mims Rogers Smith LLP
SouthState Bank Building
600 Luckie Drive, Suite 415
Birmingham, AL 35223
Email: brogers@bainbridgemims.com; sblanton@bainbridgemims.com
*Counsel for Indemnity Claimants Daphne Robinson and James Hopson Sanford*

Richard E. Smith
Christian & Small
Financial Center
505 North 20th Street, Suite 1800
Birmingham, AL 35203
Email: RESmith@csattorneys.com
*Counsel for Indemnity Claimant Dr. Joan Vignes Newman*

Robert Baugh
Dentons Sirote P.C.
2311 Highland Avenue South
Birmingham, AL 35205
Email: robert.baugh@dentons.com
*Counsel for Indemnity Claimant Dr. Judith Favor*

J. Rushton McClees
Dentons Sirote P.C.
2311 Highland Avenue South
Birmingham, AL 35205
Email: rushton.mcclees@dentons.com
*Counsel for Indemnity Claimant Joseph W. Matthews, Jr.*

Maxwell H. Pulliam
Maxwell H. Pulliam LLC
The Kress Building
301 19th Street North, Suite 519
Birmingham, AL 35203
Email: max@mpulliam.com
*Counsel for Indemnity Claimants Charles F. Dunkin, Roy A. Barnett, Jr., and Bruce Fuller*

(c)     If to a Baptist Entity, to the addresses, facsimile numbers, or electronic mail addresses set forth below such Baptist Entity's signature hereto (or as directed by any transferee thereof), as the case may be, with copies to:

Dennis R. Bailey
Rushton, Stakely, Johnston & Garrett, P.A.

16

184 Commerce Street (36104)
Post Office Box 270 (36101-0270)
Montgomery, Alabama
Email: DRB@rushtonstakely.com
*Counsel for the Baptist Entities*

Scott Salter
Starnes Davis Florie LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Email: SSalter@starneslaw.com
*Counsel for the Baptist Entities*

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

24.    Settlement Discussions. This Agreement and the Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.

25.    [Intentionally omitted.]

26.    No Solicitation; Adequate Information. This Agreement is not and shall not be deemed to be a solicitation for votes for the acceptance of the Plan (or any other Chapter 11 plan) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or a solicitation to tender or exchange any securities. The votes of the holders of claims against the Debtor will not be solicited until such holders who are entitled to vote on the Plan have received the Plan, the Disclosure Statement, and related ballots, and other required solicitation materials. In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a Chapter 11 plan of reorganization or an offering of securities, each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (a) is a Qualified Institutional Buyer (as defined in Rule 144A of the Securities Act of 1933 (the "**Securities Act**")), "institutional accredited investor" (within the meaning of Rule 501(a) of the Securities Act), or Non-"U.S. Person" (as defined in Regulation S of the Securities Act), (b) understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (c) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant

17

to the Restructuring and understands and is able to bear any economic risks with respect to such investment.

27.     Interpretation; Rules of Construction; Representation by Counsel. When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**JUDSON COLLEGE, INC.:**

By _Daphne R Robinson_

Name: Daphne R. Robinson

Title: President

**Consenting Banks:**

**Marion Bank &Trust n/k/a Marion Community Bank**

By_____

Name:  R. Guy Davis, Jr.

Title:  President

Principal Amount of Loans under Credit Agreement:  $2,534,484.81

Notice Address:

7480 Halcyon Pointe Dr., Suite 101

Montgomery, AL 36117

**West Alabama Bank and Trust**

By_____

Name:  Rob Finney

Title:  Chief Executive Officer

Principal Amount of Loans under Credit Agreement:  $1,610,207.19

Notice Address:

509 1st Avenue West

Reform, AL 35481

**First Cahawba Bank**

By_____

Name:  Richard A. Walters

Title:  President / CEO

Principal Amount of Loans under Credit Agreement:  $921,790.47

Notice Address:

**Consenting Banks:**

**Marion Bank &Trust n/k/a Marion Community Bank**

By_____

Name:  R. Guy Davis, Jr.

Title:  President

Principal Amount of Loans under Credit Agreement: $2,534,484.81

Notice Address:

7480 Halcyon Pointe Dr., Suite 101

Montgomery, AL 36117

**West Alabama Bank and Trust**

By_____

Name:  Rob Finney

Title:  Chief Executive Officer

Principal Amount of Loans under Credit Agreement:  $1,610,207.19

Notice Address:

509 1st Avenue West

Reform, AL 35481

**First Cahawba Bank**

By_____

Name:  Richard A. Walters

Title:  President / CEO

Principal Amount of Loans under Credit Agreement:  $921,790.47

Notice Address:

**Consenting Banks:**

**Marion Bank & Trust n/k/a Marion Community Bank**

By_____

Name: R. Guy Davis, Jr.

Title: President

Principal Amount of Loans under Credit Agreement: $2,534,484.81
Notice Address:
7480 Halcyon Pointe Dr., Suite 101
Montgomery, AL 36117

**West Alabama Bank and Trust**

By_____

Name: Rob Finney

Title: Chief Executive Officer

Principal Amount of Loans under Credit Agreement: $1,610,207.19
Notice Address:
509 1st Avenue West
Reform, AL 35481

**First Cahawba Bank**

By_____

Name: Richard A. Walters

Title: President / CEO

Principal Amount of Loans under Credit Agreement: $921,790.47
Notice Address:
2610 Citizens Parkway
Selma, AL 36702

**Consenting Banks:**

**Marion Bank &Trust n/k/a Marion Community Bank**

By_____

Name:  R. Guy Davis, Jr.

Title:  President

Principal Amount of Loans under Credit Agreement: $2,534,484.81

Notice Address:

7480 Halcyon Pointe Dr., Suite 101

Montgomery, AL 36117

**West Alabama Bank and Trust**

By_____

Name:  Rob Finney

Title:  Chief Executive Officer

Principal Amount of Loans under Credit Agreement:  $1,610,207.19

Notice Address:

509 1st Avenue West

Reform, AL 35481

**First Cahawba Bank**

By_____

Name:  Richard A. Walters

Title:  President / CEO

Principal Amount of Loans under Credit Agreement:  $921,790.47

Notice Address:

2610 Citizens Parkway

Selma, AL 36702

**Baptist Entities:**

**The Alabama Baptist State Convention**

By _Rick Lance_

Name: _RICK LANCE_

Title: _EXECUTIVE DIRECTOR_

**The State Board of Missions of the Alabama Baptist State Convention**

By _Rick Lance_

Name: _RICK LANCE_

Title: _EXECUTIVE DIRECTOR_

**The Baptist Foundation of Alabama**

By_____

Name: _____

Title: _____

Rick Lance, Individually

2610 Citizens Parkway

Selma, AL 36702

**Baptist Entities:**

**The Alabama Baptist State Convention**

By_____

Name: _____

Title: _____

**The State Board of Missions of the Alabama Baptist State Convention**

By_____

Name: _____

Title: _____

**The Baptist Foundation of Alabama**

By _____

Name: _John E Ashworth_

Title: _President_

_Charles F. Dul_

Charles F. Dunkin

_____

Roy A. Barnett, Jr.

_____

Bruce Fuller

_____

Joseph W. Matthews, Jr.

_____

Judith Karen Favor

_____

Daphne Robinson

_____

Charles F. Dunkin


*Roy Barnett Jr* (signature)
_____

Roy A. Barnett, Jr.


_____

Bruce Fuller


_____

Joseph W. Matthews, Jr.


_____

Judith Karen Favor


_____

Daphne Robinson

_____

Charles F. Dunkin


_____

Roy A. Barnett, Jr.


_Bruce Fuller_ _____ _Bruce Full_____

Bruce Fuller


_____

Joseph W. Matthews, Jr.


_____

Judith Karen Favor


_____

Daphne Robinson

_____

Charles F. Dunkin


_____

Roy A. Barnett, Jr.


_____

Bruce Fuller


Joseph W. Matthews, Jr. _by Melinda M Matthews_
Joseph W. Matthews, Jr. _agent under POA_


_____

Judith Karen Favor


_____

Daphne Robinson

_____

Charles F. Dunkin


_____

Roy A. Barnett, Jr.


_____

Bruce Fuller


_____

Joseph W. Matthews, Jr.


_Judith Karen Favor_
_____

Judith Karen Favor


_____

Daphne Robinson

_____

Charles F. Dunkin

_____

Roy A. Barnett, Jr.

_____

Bruce Fuller

_____

Joseph W. Matthews, Jr.

_____

Judith Karen Favor

_____

Daphne R. Robinson

_Joan Vignes Newman_
Joan Vignes Newman

_____
James Hopson Sanford

_____

Joan Vignes Newman

_James Hopson Sanford_
James Hopson Sanford

Indenture Trustee:

Regions Bank, as Indenture Trustee:

By _____

Name: _____Scott Rearden_____

Title: _____Senior Vice President_____

<u>APPROVING BOND HOLDER:</u>

Edward W. Mudd, Jr.

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$195,000.00

_____

Edward W. Mudd, Jr.

APPROVING BOND HOLDER:

Edward W Mudd Sr Marital Trust

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$80,000.00

Edward W. Mudd Jr
_____
PRINT NAME

_____
Edward W. Mudd, Jr. and/or
William Mudd

William Mudd
_____
PRINT NAME

_____
Edward W. Mudd, Jr. and/or
William Mudd

APPROVING BOND HOLDER:

William Mudd

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:
$25,000.00

_____
William Mudd

<u>APPROVING BOND HOLDER:</u>

Jane F Rothschild Revocable Trust

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$150,000.00

Jane F. Rothschild

APPROVING BOND HOLDER:

Dale A Glasscock

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$100,000.00

_a. Dale Glasscock_  12/21/23

Dale A. Glasscock

APPROVING BOND HOLDER:

Harrison Holt

I hereby certify my ownership of the following Bonds:

███████████ ■

Outstanding Principal Amount Held:

$35,000.00

_____

Harrison Holt – Signature

31

APPROVING BOND HOLDER:

Robert L Nunnally

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$50,000.00

Robert L. Nunnally

32

APPROVING BOND HOLDER:

Ted L Mann

I hereby certify my ownership of the following Bonds:

Outstanding Principal Amount Held:
$25,000.00

| Ted L. Mann | Keith Y Mann |
| PRINT NAME | PRINT NAME |

Ted L. Mann and/or
Venita Y. Mann

Ted L. Mann and/or
Venita Y. Mann

APPROVING BOND HOLDER:

Frederick P. Fish, Jr. Management Trust

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$100,000.00

Frederick P. Fish
Frederick P. Fish

34

APPROVING BOND HOLDER:

Anne R. Fish Management Trust

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$175,000.00

_Anne R. Fish_

Anne R. Fish

APPROVING BOND HOLDER:

The Estate of Reta Mudd

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$125,000.00

_Edward Mudd_      _William Mudd_
PRINT NAME                 PRINT NAME

_____     _____
William Mudd and/or              William Mudd and/or
Edward Mudd                   Edward Mudd

APPROVING BOND HOLDER:

Belser Family Trust

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$45,000.00

WILLIAM W. BELSER III
PRINT NAME

Maud Belser and/or
William Belser

MAUD BELSER
PRINT NAME

Maud Belser and/or
William Belser

By M.W.B III
ATTY IN FACT
UNDER PCA.

PER THE TRUST INSTRUMENT,
ONLY ONE TRUSTEE SIGNATURE
IS REQUIRED

37

<u>APPROVING BOND HOLDER:</u>

Berney Life Insurance Trust

I hereby certify my ownership of the following Bonds:

Outstanding Principal Amount Held:

$25,000.00

Diane S. Berney

## APPROVING BOND HOLDER:

Newman Hosmer Waters, Jr. Trust

I hereby certify my ownership of the following Bonds:



**Outstanding Principal Amount Held:**

**$50,000.00**

_Nathan Waters_
**PRINT NAME**

_[signature]_

Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

_NEWMAN WATERS III_
**PRINT NAME**

_[signature]_

Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

**PRINT NAME**

Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

39

**APPROVING BOND HOLDER:**

Newman Hosmer Waters III Trust dtd 3/1/2020

I hereby certify my ownership of the following Bonds:

█████████████

**Outstanding Principal Amount Held:**

$30,000.00

_Nathan Waters_
PRINT NAME

_Nathan Waters_ (signature)
Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

_Newman Waters III_
PRINT NAME

_Newman Waters_ (signature)
Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

PRINT NAME

Newman Waters, III and/or
Aaron Waters and/or
Nathan Waters

40

## AMENDMENT
## TO
## THE NEWMAN HOSMER WATERS, III TRUST

Under date of March 1, 2020 a Trust Agreement entitled THE NEWMAN HOSMER WATERS, III TRUST was created. Under the Trustor's right to alter or amend this Trust Agreement, as stated in Article II, A, the Trustor does hereby affirm this instrument, but amend only the following:

Under powers granted to Trustor in ARTICLE IX, D, Trustor does hereby remove as Trustee, Aaron K. Waters, at his request, due to his recent move and business obligations.

IN WITNESS WHEREOF, NEWMAN HOSMER WATERS, III, Trustor, does hereby amend said THE NEWMAN HOSMER WATERS, III TRUST.

_Newman Hosmer Waters, trustee_
NEWMAN HOSMER WATERS, III, TRUSTOR

STATE OF ALABAMA )

JEFFERSON COUNTY )

On this the 24th day of Feb, 2022, before me, the undersigned, a Notary Public, at large, in and for the State of Alabama, personally appeared NEWMAN HOSMER WATERS, III, as Trustor, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

WITNESS my hand and official seal.

_Javetta Delois Webster_
Notary Public
My commission expires_____12/21/25_____.

## ACCEPTANCE OF RESIGNATION AS TRUSTEE
## TO
## THE NEWMAN HOSMER WATERS, Jr. TRUST


Under date of May 8, 2000, a Trust Agreement entitled THE NEWMAN HOSMER WATERS, Jr.

TRUST was created.  Under terms of ARTICLE IX, C, Trustee and Beneficiary does hereby

acknowledge the resignation of AARON K. Waters as co-trustee of aforementioned trust.


FEBRUARY 24, 2022

**Date**

NEWMAN HOSMER WATERS III
TRUSTEE / BENEFICIARY


WITNESS:


JANET K. WATERS

2/24, 2022
**Date**


NATHAN E. WATERS

2/24/2022
**Date**

APPROVING BOND HOLDER:

Carolyn Patterson

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$470,000.00

Carolyn Patterson

41

APPROVING BOND HOLDER:

Donna R. Loyed

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$75,000.00

_Donna R. Loyed_
Donna R. Loyed

42

<u>APPROVING BOND HOLDER:</u>

Sarah Holt

I hereby certify my ownership of the following Bonds:

███████████

Outstanding Principal Amount Held:

$30,000.00

Sarah Holt

APPROVING BOND HOLDER:

Ann Vaughan

I hereby certify my ownership of the following Bonds:

████████████

Outstanding Principal Amount Held:

$10,000.00

Ann Vaughan

44

<u>APPROVING BOND HOLDER:</u>

First Bank of Alabama

I hereby certify the above named institution's ownership of the following Bonds:



Outstanding Principal Amount Held:

$305,000.00

And



Outstanding Principal Amount Held:

$320,000.00

Chad M. Thomas, EVP and CFO
First Bank of Alabama

APPROVING BOND HOLDER:

First Bank of Boaz

I hereby certify the above named institution's ownership of the following Bonds:



Outstanding Principal Amount Held:

$500,000.00

Corey Ray, President
First Bank of Boaz

<u>APPROVING BOND HOLDER:</u>

FirstState Bank (f/k/a First State Bank Lineville)

I hereby certify the above named institution's ownership of the following Bonds:



Outstanding Principal Amount Held:

$500,000.00

_Carlton DeVaughn_

Carlton DeVaughn, CFO
FirstState Bank

**APPROVING BOND HOLDER:**

Frank C Mann II

I hereby certify my ownership of the following Bonds:



Outstanding Principal Amount Held:

$1,000,000.00

_Frank C. Mann_

Frank C. Mann

APPROVING BOND HOLDER:

Alabama One Credit Union (transferee of First Bank of Linden)

I hereby certify the above named institution's ownership of the following Bonds:

Outstanding Principal Amount Held:
$250,000.00

_____

Whitney Oswalt, CFO
Alabama One Credit Union

**EXHIBIT D**

**Liquidation Analysis**

**<u>Liquidation Analysis</u>**

Section 1129(a)(7) of the Bankruptcy Code requires that a creditor with a right to vote either accept the Plan, or, alternatively, receive under the Plan at least as much as it would receive if the debtor's assets were liquidated and the proceeds distributed in a Chapter 7 liquidation. This is generally known as the "best interests of creditors" test. As set forth below, the Debtor's Plan satisfies the standard. To apply the test, the debtor's assets are valued in the context of a distressed liquidation in a Chapter 7 case by a Chapter 7 trustee appointed by the Bankruptcy Court. The estimated values take into account the costs and expenses of the liquidation, and such additional administrative and priority claims that may result from conversion of the case to a Chapter 7 for the purpose of liquidation. Net liquidation proceeds would be paid to general unsecured creditors only to the extent funds are available after secured creditors have been paid the full value of their collateral and priority creditors receive full payment on their claims.

The Plan satisfies the best interests test[1] because, through the Comprehensive Mediation Settlement upon which the Plan is founded, the Plan makes the Debtor's Restricted Funds available for distribution to the Debtor's creditors and eliminates the substantial litigation and administrative costs that the Debtor's Estate would incur if the Debtor's Plan were not confirmed and the Debtor's assets instead liquidated in Chapter 7. The Restricted Funds are held by the Debtor subject to restrictions that limit the use of such funds to designated charitable purposes. Because of such restrictions, the Debtor has maintained that such Restricted Funds are not available to pay creditors' claims and would not be property of its bankruptcy estate should it file for bankruptcy, barring the Debtor seeking and obtaining state court approval pursuant to UPMIFA to modify the restrictions on such funds in order to pay creditor claims. Pursuant to the UPMIFA Order, the Debtor has duly modified the restrictions on the Restricted Funds to allow such funds to be used to pay creditor claims, but such modifications are conditioned upon the Debtor's confirmation of this Plan. If the Plan is not confirmed, then the Debtor asserts that the Restricted Funds are not available to pay the claims of its creditors and, instead, would be disposed in accordance with the Debtor's alternative direction as approved by the state court having jurisdiction over such matter. The Plan, if confirmed, therefore provides for the distribution of approximately $7 million in Restricted Funds that the Debtor asserts would not otherwise be available to pay creditors in a Chapter 7 liquidation.[2]

---

[1] The application of the "best interests of creditors" test is complicated in a chapter 11 case involving a non-profit corporation like the Debtor, as the Bankruptcy Code prohibits both the commencement of involuntary bankruptcy cases against a non-profit entity and the conversion of a non-profit's voluntary chapter 11 case to a Chapter 7 absent the non-profit's consent. *See* 11 U.S.C. § § 303(a), 1112(c). The College has filed its Chapter 11 Case solely to implement the Comprehensive Mediation Settlement through this Plan, and made clear in the Comprehensive Mediation Settlement Agreement its intention to dismiss this Chapter 11 Case and to wind-down its affairs outside of bankruptcy if it is unable to confirm this Plan. Accordingly, Chapter 7 is not in the foreseeable future for the Debtor, even if the Plan is not confirmed. Because of the practical unavailability of any relief to creditors under Chapter 7, the Debtor posits that the Plan satisfies Section 1129(a)(7) without the need to engage in the liquidation analysis and comparison that is generally undertaken when evaluating Chapter 11 plans of for-profit entities. The Debtor raises, but does not press, this issue, as the Debtor's Plan clearly provides for all of its creditors to receive at least as much through the Plan as they would if the Debtor's assets were liquidated in a hypothetical Chapter 7 proceeding.

[2] If the Plan is not confirmed in form and substance substantially as agreed by the Debtor and the other parties to the Plan Support Agreement, significant and complex litigation regarding the Restricted Funds is likely to ensue, as all parties have reserved their respective rights and remedies in such an event.

The Debtor anticipates that, if the Debtor's case were hypothetically converted to a Chapter 7 case (which could only happen with the Debtor's consent pursuant to 11 U.S.C. § 1112(c), as the Debtor is a non-profit corporation), litigation would likely be brought by the Chapter 7 Trustee and/or creditors of the Debtor over whether the Restricted Funds constitute property of the Debtor's Estate that would be available to pay creditor claims. The Debtor would vigorously dispute any efforts to characterize the Restricted Funds as property of its Chapter 7 Estate, and suspect the Attorney General of the State of Alabama would, too, with both parties likely to argue that the Alabama state courts, not the Bankruptcy Court, had proper jurisdiction over the disposition of the Restricted Funds. Any litigation over the control and characterization of the Restricted Funds would be costly and uncertain, with the costs of such litigation to be borne by the Debtor's Estate to the detriment of all of the Debtor's creditors. Such litigation in the Chapter 7 context would undoubtedly delay and dissipate, if not eliminate, any recovery by creditors from the Restricted Funds, compared to the relief offered to creditors under the Plan. Together, the Plan, the Comprehensive Mediation Settlement, and the UPMIFA Order allow for such Restricted Funds to be used consensually to pay Allowed Administrative Claims and other Allowed Claims against the Debtor, provided that the Plan is confirmed. Because the Plan creates a litigation-free means for making the Restricted Funds available to pay Allowed Claims, the Plan satisfies the best interests of creditors test.